**RUDY CHOY, WARREN SEAMAN,
ALFRED KUMULAE, Co-Partners,
Doing Business As CHOY,
SEAMAN and KUMULAE**

v.

**ELMER H. BOUCHELLE, Appellant**

No. 16,584

United States Court of Appeals

Third Circuit

Argued January 26, 1970
Decided October 9, 1970

Before HASTIE, *Chief Judge,* GANEY and STAHL,*
*Circuit Judges*

OPINION OF THE COURT

GANEY, *Circuit Judge*

A jury awarded plaintiffs $15,000 on their claim for the balance due them by defendant under both a design fee and a boat construction contract and for special damages, and found against the latter on his counterclaim for loss of a charter season. The district court denied, without opinion, defendant's post-trial motions for judgment n.o.v. and for a new trial wherein it was alleged that the contract was so vague and indefinite with regard to prices, the times of delivery and what was to be delivered, as to render it unenforceable. Additionally, the plaintiffs' motion for bill of costs, as well as for an attorney's fee in the sum of $3,020.00, plus $94.06 for disbursements was allowed, to which the defendant objected and this appeal followed. We agree with the district court's denial of the motion for judgment n.o.v., but would grant the motion for a new

---

* Judge Stahl participated in the hearing and consideration of this appeal but died before decision.

trial, and the remaining contention for counsel fees has no relevancy in the disposition of this case.

After much long distance correspondence between the parties, plaintiffs, designers and builders of pleasure boats in California, by letter of January 11, 1962, advised defendant, a charter boat captain in the Virgin Islands, of what they felt would be "a realistic and fair completed construction cost" of a 51-foot charter catamaran. A portion of the letter stated:

Here is a breakdown of what we feel to be a realistic and fair completed construction cost of this catamaran if built by our yard:

*Materials, Equipment & Rig (at our cost)*

| | |
|---|---|
| 1. Lumber & materials | $5,000 |
| 2. Fiberglass, resins & plastics | $1,500 |
| 3. Interior hardware, equipment & fixtures | $2,000 |
| 4. Marine hardware | $2,000 |
| 5. Rigging | $ 555 |
| 6. Working sails | $1,000 |
| 7. Spars | $1,700 |
| 8. Cushions & mattresses | $ 700 |
| 9. Generator (diesel) | $ 900 |
| 10. Edison steering equipment | $ 900 |
| | $16,250 |

*Labour*

1. 4 boat builders (including taxes and benefits)
2. $3,150.00 labor cost per month for 6 months.

 *Labour Cost Total*—$18,900.00

 Profit—5% of $35,150.00

To this you must add cost of two 40 H.P. outboard motors, awning, fuel tanks, shower equipment or electronic equipment . . . .

On April 25, 1962, the defendant, in the Virgin Islands, signed a written form agreement prepared by the plaintiffs and sent to him from California, where plaintiffs'

boat shop and office were located, with an accompanying letter by mail dated twenty days earlier, or April 5, 1962. [1] Under the agreement, defendant, as owner, hired plaintiffs, as the contractor, to build a day-sailing catamaran in California according to plans and specifications which were subject to change within certain limits by defendant before completion of the boat, and any additional expenses caused by these changes were to be paid by defendant. Besides the administrative expenses, which included seven categories, the total contract price was estimated to be $35,150 plus a fixed profit not to exceed 5% of that figure. No date was set for the completion of the boat, but construction time was estimated to take six months. The boat was built and launched, but before paying the balance which plaintiffs claimed was due them and without their permission, defendant in the middle of May of 1963, took possession of the boat and sailed it from California to the Virgin Islands via the Panama Canal, a distance of approximately 5,000 nautical miles. In September of 1964, while the vessel was still in the possession of defendant, plaintiffs brought the action here involved in the District Court of the Virgin Islands. Jurisdiction of the court was invoked on the grounds of diversity.

---

[1] Paragraphs 2 and 3 of this letter read as follows:

2. It is important for you to outline any changes in general arrangement you may desire within 30 days of the date construction starts. It has been our experience that the main reason building costs exceed the stated price is due to changes insisted upon by owners during construction. This can increase labor costs by an astonishing amount. The reason for this is design changes, work slow-down and confusion, and usually additional material or construction complexity.

3. The contract is based upon continuous and uninterrupted construction from lofting till launching. I wish to emphasize now that if we are forced to slow-down or halt work because of lack of funds, you must anticipate additional expense. This extra amount would be $75.00 per month for space rental plus "mothballing" costs (covering boat with tarpaulin or plastic covers). Storage costs under these conditions would amount to approximately $100 to $125 per month until construction starts again when funds are available.

■ The contract stated that the vessel was to be delivered within a reasonable time from the execution of the contract, and is silent concerning a penalty in the event of an unreasonable delay in delivery. This provision does not render the contract vague. The law assumes a reasonable time even when no time is stated. By the terms of the contract, it was estimated that the vessel would be completed within six months from the signing of the contract, but no definite date was given because the defendant was permitted to make changes in the plans which might cause delay in the completion of the vessel.

Plaintiffs claimed and offered evidence to prove that defendant's actions delayed delivery of the vessel by five months, paragraph 4 of the contract stating:

In the event that construction time is unnecessarily delayed by OWNER'S failure to comply with the installment payments of the purchase price as set forth in paragraph (3) hereof, OWNER hereby agrees to pay CONTRACTOR all additional costs and expenses incurred due to said delays.

■ While the contract price here is not particularly definite, it need not be, for it may be left to be fixed in a manner to be agreed by the parties. Here the price was purposely left indefinite because it was made to depend on the actual cost of construction which included a number of items, the value of which could not be determined until the vessel was delivered to the defendant. However, at trial the plaintiffs claimed the following amounts:

| | |
|---|---|
| 1. Contract figure | $35,150.00 |
| 2. Fixed profit (5% of $35,150.00) | 1,757.50 |
| 3. Mothballing for two months | 450.00 |
| 4. Rental of yard ($75 a month for 11 months) | 825.00 |
| 5. Overhead ($65 a month for 11 months) | 715.00 |
| 6. Administrative expenses for 11 months | 525.00 |
| 7. Extras | 4,512.51 |
| 8. Insurance (for 11 months) | 780.44 |

11

9. Property tax ................................................... 71.12

| | |
|---|---:|
| Sub-Total ................................................... | $44,786.58 |
| 10. Design fee (10% of construction cost) ................... | 4,478.66 |

| | |
|---|---:|
| Total ......................................................... | $49,265.24 |

From this total plaintiffs subtracted the following amounts: $32,465.00, of which $1,260.00 was for the design fee, paid them by defendant; and $2,007.00, a credit for items bought by defendant and for which admittedly plaintiffs should have supplied under the contract. This left a balance of $14,793.24.

The payment schedule in paragraph (3) of the contract provides for six installments with the initial payment of $6,000.00 to be paid upon the execution of the contract. Installments two to five, respectively, of $6,000.00 each were to be paid on or before the first of June, July, August and September, and the sixth, or balance, on or before the first of October. The first four installments were paid on time, but the fourth was one thousand dollars short. The fifth, $7,000.00 in amount, was not paid until December 5, 1962, sometime after defendant arrived in California; and the sixth was never paid except for a number of checks for various items totaling $1,205.00. Due to the failure of the defendant to make the required payments due under the contract, plaintiffs alleged they were compelled to stop all work and in November they mothballed the vessel and notified defendant by telegram dated November 10, 1962, that work had been halted.

Regarding the $450.00 mothballing item, Rudy Choy, one of the plaintiffs, testified that once a boat is mothballed, work on the boat cannot be immediately resumed. This is so, he said, because, in addition to protecting the vessel from the elements, tools and plans are put away; the scaffolding removed; orders for future items are can-

celled; material, previously ordered and received must be returned to the supplier or safely stored so that it won't be destroyed or stolen. Also, workers assigned to build the vessel must be laid off or diverted to other projects. And even if the work is resumed at a moment's notice, it takes weeks before the pace is in full stride again.

Under the contract defendant agreed to pay the administrative expenses pertaining to construction. These include taxes, shop and space rent at $75.00 per month at the yard, construction insurance, an administrative fee of $50.00 per month, and estimated additional overhead not to exceed $400.00 during a six-month period, launching and moving expenses and costs incidental to sea trials. Choy testified that they came to $2,916.50 over an eleven-month period, approximately $1,180.00 of which may be attributable to the last five months of that period.

When work was resumed on the vessel after the December 5 payment was received, defendant was granted permission to live on the uncompleted vessel along with a crewman brought to California for the purpose of sailing it to the Virgin Islands. Plaintiffs did this to save defendant and the crewman the cost of staying at a hotel. Moreover, the defendant, and others at his request, did some work on the boat, most of which plaintiffs denied they consented to, such as sandpapering, adding extra coats of paint and installing fixtures. Defendant also requested a number of changes in the original plans after the vessel had undergone construction.[2] These actions, along with defendant's failure to pay the sixth installment, Choy stated from the witness stand, caused delay in the construction of the vessel.

---

[2] Paragraph (9) of the contract provides: "Any additional expenses incurred due to changes approved by CONTRACTOR at OWNER'S request, shall be in addition to the purchase price. . . ."

In April of 1963, the vessel was launched, and it was put through crowded anchorage maneuvers, the mast and rigging adjusted and the outboard motors tested by plaintiffs. While they were waiting for bad weather to put the vessel through rough water trials so as to complete plaintiffs' obligations under the contract, defendant made off with the boat at nighttime, without the plaintiffs' consent, as hereinbefore adverted to.

During defendant's stay in California, a dispute arose between the parties as to what constituted an "extra" under paragraph 2 of the contract. In effect, plaintiffs claimed that the mere hull and rough bare outline of the cabin alone constituted the completed vessel and just about everything below was an extra. Defendant, on the other hand, believed that all items shown on the final plans, which were prepared by plaintiffs, except those items specifically mentioned to him as extras in the letter of April 5, 1962,[3] accompanying the contract, were part of the completed boat and were included in the contract price. However, while the letter accompanied the contract, it was not indicated therein in any wise that it was to be made a part thereof.

Paragraph 2 of the contract provides in part:

CONTRACTOR agrees to construct, build, assemble and complete said vessel in accordance with said design, plans and specifications, and any final plans and specifications to be completed by CONTRACTOR subsequent to the execution of this agreement, or after construction has been commenced by CONTRACTOR. . . . CON-

---

[3] Paragraph 4(c) of this letter reads as follows:
 4. Please note that the contract says, "is estimated not to exceed the sum of $35,150.00, etc." The reasons for not stating a fixed price are:

 \* \* \*

 c. We've been fairly successful of holding to estimated prices, not counting extras, simply because we have a policy of submitting for the Owner's approval everything purchased for the boat (with the exception of lumber, fibreglas, resins, spars and steering equipment) before placing a firm order. In other words, you will have to approve sail costs, interior hardware list, marine hardware list, cushions and mattress prices, Generator, O/B motor and other equipment before they are purchased.

14

TRACTOR shall construct said vessel in accordance with general specifications, general arrangement drawings, and other finished drawings. CONTRACTOR shall furnish all materials required in said constructions, excepting *extras* and optional items desired by OWNER. (Emphasis supplied.)

And paragraph 19 states:

This contract contains the entire agreement between the parties, and any alteration or modification thereof shall not be effective unless also reduced to writing and executed by both parties thereto.

There was no evidence to show that the contract was altered or modified in the manner provided in paragraph 19.

The term "extra" is not defined or explained in the contract. However, there were two plans. The first was a general arrangement drawing pursuant to which the vessel was constructed. It was dated August 4, 1961, almost nine months before the signing of the contract, and showed a top and side view of the vessel with the unbroken outline of the following equipment and fixtures in various locations within the outline of the vessel: "Edison" steering pedestal, rudder, helmsman swivel chair, seat cushions, 1,500 W generator, battery, two water tanks (capacity in gallons), ice box, galley sink, "Hiller" alcohol range, shower fixtures and curtain, two wash basins, two water closets, medicine locker, forward and aft safety nets, and a portable loading ramp.[4] Placed in broken outline within the outline of the vessel are two Johnson 40 H.P. outboard motors, fuel tanks, and two removable canvas tops with their supporting poles.

 Choy testified that the estimated contract price of $35,150.00 was for a rough bare outline of the vessel with an initial coat of paint so that the defendant, whose funds admittedly were extremely limited, could sail the

---

[4] This listing is not necessarily a complete one.

15

vessel to the Virgin Islands where he could repaint it and add equipment to it at his convenience. He stated that the equipment and fixtures appearing on the August 4, 1961 plan, in broken lines, were placed thereon for the purpose of showing their most convenient location in the event defendant ordered any of them. Written correspondence of preliminary negotiations between the parties offered by plaintiffs to bolster Choy's position was introduced into evidence. The preliminary negotiations might have been of some aid in solving the problem as to what items fit into the category of extras, but evidence of those negotiations, with the exception of the letter of January 11, 1962,[5] which the parties concede is a criteria for determining extras, were inadmissible. Under California law, which is to be applied here, when the parties have agreed that a written contract is an integration, as here, evidence of prior or contemporaneous negotiations is inadmissible to vary the terms of the written agreement. Parsons v. Bristol Development Co., 1965, 62 C.2d 861, 402 P.2d 839; Mangini v. Wolfschmidt, 1958, 331 P. 728. The rule does not prevent a party from conceding that the contract does not express the entire agreement. Absent any indication in the contract or plans to the contrary, paragraph 2, supra, means that the plaintiffs will build and complete a vessel with all the items appearing on the plans. The illustrations in broken lines, in contrast to those in solid outlines, is some indication that they might not be included in that plan, but were drawn to show their location on the completed vessel. However, the defendant admitted that the outboard motors were his responsibility. With respect to the fuel tanks shown in broken outline on the plan, the letter of January 11, 1962,

---

[5] Counsel for defendant concedes that the letter of April 5, 1962, may be used to determine what are extras. This letter contains no criteria for making that determination. The letter of January 11, 1962, a portion of which is quoted in the beginning of the opinion, does.

which set forth the breakdown of the material and equipment which was to be included by the plaintiffs under the contract price, sets them forth as an extra, as well as the shower and electronic equipment.

The plaintiffs claimed $4,512.52 for extras, which sum represented the total of certain items appearing in invoices and check-marked in red pencil. Choy testified that these items were ordered by the defendant and charged to the plaintiffs' account without their consent, and since there was no provision in the contract which permitted defendant to purchase items for the vessel in this manner, unless they were agreed to, they should be considered as extras. While the defendant made no effort to demonstrate that the amount claimed was within the contract price and not extras, the burden was on him to go forward with evidence concerning this sum and the jury, under proper instructions from the court, was at liberty to decide whether these items were extras to be paid for by the defendant, or whether they were within the contract price.

The second plan, dated January of 1963, more than nine months after the signing of the contract, outlined the assembly and location of an elaborate electrical system for the vessel. This system constituted an additional expense, for paragraph 9 of the contract states:

That any additional expenses incurred due to changes approved by CONTRACTOR at OWNER'S request shall be in addition to the purchase price . . . .

The installation of the electrical wiring system was performed by a technician hired by defendant. However, Choy testified that the plaintiffs would have installed on the vessel a simple running light system consisting of three or four lights, one for each side, the stern, and perhaps one on the bow, respectively, and he would consider

17

it fair to give the defendant an allowance for that system. Since the system installed by the defendant was a much more elaborate one, the jury should have been instructed that the defendant was entitled to a credit for the value at plaintiffs' cost of a simple running light system and that the plaintiffs should not be bound by the cost of the elaborate system set up by the defendant.

This case presents a complex factual situation concerning the price of the boat. It also presents a serious factual question as to whether the delay in delivery from six to eleven months was chargeable to the defendant or not. Additionally, there was the ascertainment, in conformity with the plans, of whether or not the broken lines on it indicated extras and were put in only to apprise the defendant of the proper place and whether the solid outlines in the plans indicated only those features which were to be installed in the vessel in conformity with the contract. Furthermore, it was questionable whether, as the plaintiff Choy testified, the sink was an extra or not; whether the defendant should be given an allowance for a plain toilet in place of the flush toilet which the plaintiffs installed; inasmuch as the plaintiffs claim that all the defendant was entitled to, under the contract, was a plain toilet.

Likewise, with respect to the generator under the plans, the jury should have been told that if they determined it to be an extra, the plaintiffs should be given credit against the more elaborate one installed by the defendant. Also in question was whether the life lines were an extra, and whether the two chain plates, as well as the safety devices for the crew and passenger, were to be considered as extras.

These are but a few of the items which were in sharp controversy during the trial of the case and were never set

forth by the trial judge in their proper perspective. The trial judge, in his charge to the jury, merely set forth the law with respect to the case, in abstract fashion, never relating it with any relevancy to the facts which were complex in nature and which required the court to elaborate on them and to give a clear guideline for their proper determination, especially with respect to the extras, which are really at the heart of the questions here posed.

■ ■ It is most important in the determination of the factual questions, such as this case presented, that the jury be given full and complete instructions by relating the law to the relevant evidence in the case. McNello v. John B. Kelly, Inc., 283 F.2d 97 (1960). As stated in Atkinson v. Roth, 297 F.2d 570, 574 (1961), "If it is to be assumed that jurors have ordinary intelligence, it may not be assumed that they are students of the law. The task of the jury, to apply the rules of law as given by the court below, certainly cannot be satisfactorily accomplished, as we pointed out in McNello, in the abstract." This applies equally to the question of whether the various amounts expended by the defendant in his claim for $7,046.29 for labor and material was done at the behest of the plaintiff and was proper and necessary for the completion of the boat according to the plans.

■ The defendant here made no objection to the charge of the court which was purely a legalistic definition of principles, as we have indicated, but by reason of the factual complexity here involved, we feel it was plain error to leave the disposition of the case to the jury under the circumstances which the court did, for if the jury was to have any understanding of the value of the matters adverted to, they should have been discussed by the court in the light of their relevancy to the law involved.

19

However, since attorney's fees and costs are awardable to the winning party, as provided in section 16[6] of the contract, and likewise in Section 541(6), Title IV, Virgin Islands Code, Volume 1A, in our disposition of the case, with respect to these items, we have no present concern.

 We consider the charge of the court, as adverted to, totally inadequate in providing legal guidelines to the relevant factual situations here involved, and though no objection was raised at trial, in reviewing the evidence here, we conclude our failure to consider this as plain error would be a miscarriage of justice. 28 U.S.C. 51.

The judgment of the lower court will be reversed and the case remanded for a new trial.

---

[6] This section provides: "16) In the event that either party shall file suit to enforce this Agreement or any part thereof, it is hereby agreed that the winning party shall be entitled to a reasonable attorney's fee and all cost of suit."