**Jean Alva FUHRMAN, Executrix of the Estate of Wilbur F. Fuhrman, Deceased**

v.

**READING COMPANY, Appellant.**

**No. 19034.**

United States Court of Appeals, Third Circuit.

Argued Jan. 4, 1971.

Decided March 11, 1971.

William J. Taylor, Morgan, Lewis & Bockius, Philadelphia, Pa. (George E. Lieberman, Denis V. Brenan, Philadelphia, Pa., on the brief), for appellant.

Joseph P. Braig, Philadelphia, Pa., Kania & Garbarino, Rosemont, Pa. (Francis Ross Crumlish, Philadelphia, Pa., on the brief), for appellee.

Before GANEY and ADAMS, Circuit Judges, and WEIS, District Judge.

## OPINION OF THE COURT

WEIS, District Judge.

In 1956 Justice Frankfurter described the Federal Employers' Liability Act as "an archaic system of compensation for injuries to railroad employees."[1] This appeal deals with a case brought under the provisions of that act. The slow progress of the litigation through the courts, its unnecessarily lengthy trial and evidentiary errors which require a partial new trial might be considered as arguments in support of the Justice's criticism of fifteen years ago.

The appellee Fuhrman, an employee of the Reading Railroad, was injured in 1963 as a result of being thrown from a boxcar by a severe impact which occurred when other cars of the defendant slammed into the train on which he was working, or so, at least, the jury could have found from the evidence produced at the trial. The fact of the impact was

---

1. Ferguson v. Moore-McCormack Lines, 352 U.S. 521, 540, 77 S.Ct. 459, 1 L.Ed.2d 515 (Dissenting Opinion) (1956).

established rather clearly but its source to a great extent rested upon inference.

At the time of the accident the plaintiff was carrying out preliminary procedures so that a locomotive could remove a string of cars from one of a series of assembling tracks in the yard at East Penn Junction, Allentown, Pennsylvania. The cars had been collected on these tracks by allowing them to coast downgrade from west to east and were then kept in position by the brakes on several of the head or easternmost cars of each string.

Fuhrman had been assigned to work with a crew in the eastern part of the yard and there was some testimony of the practice to have another crew at work in the western end of the yard.

The plaintiff was working under the orders of the conductor who testified that he had been told by the yardmaster to get the cars, that they were ready to be taken to another yard farther to the east. The plaintiff was led to believe that the cars were "all in" on the storage track, meaning, as he said, "that there is no other cars going in on that track * * * it's safe to go in there and get them, and there will be no more cars throwed in there against you."

It was about 9:00 P.M. and the darkness and a curve in the track to the west prevented the crew from seeing the last cars of the train. While the plaintiff was releasing the brake on one of the boxcars near the engine, there was an impact from the west end of the train, moving the cars and the engine about half a car's length to the east. It was a "hard bump" as the conductor described it and as to its source he said, "We knew something had hit down the other end." While Fuhrman could not say what caused the blow, he testified, "The only thing I can say would be the impact from the other cars against the draft of cars I was working on."

Plaintiff's proof of how the accident happened is far from overwhelming but the record contains enough facts from which the jury might conclude that the Railroad had supplied an unsafe place to work; that the most logical explanation of the occurrence—indeed almost the only one—was that employees of the defendant in the western end of the yard routed additional cars onto the track on which Fuhrman was working, contrary to his expectations and company policy.

The Supreme Court has outlined the area of the jury's responsibility in this type of case in the following language:

" * * * and for practical purposes the inquiry in these cases today rarely presents more than a single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial from which the jury may with reason make that inference."[2]

On another occasion the Court said:

"It is no answer to say that the jury's verdict involves speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear."[3]

The plaintiff's burden was met in this case and the District Court properly refused the defendant's motion for judgment n.o.v. and new trial.

2. Rogers v. Missouri Pacific Railroad, 352 U.S. 500, 508, 77 S.Ct. 443, 449, 1 L. Ed.2d 493 (1956).

3. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1945). See also Carter v. Union Railroad, 438 F.2d 208 (3rd Cir. Feb. 8, 1971).

With respect to the damage phase of the case, however, there are serious deficiencies which require the grant of a limited new trial.

Shortly after the fall on December 15, 1963, the plaintiff was admitted to the Sacred Heart Hospital where a Dr. Walkow made a diagnosis of fractures of several ribs on the right in the mid-axillary, a fracture of the clavicle at its distal end, and a slightly depressed fracture of the manubrium of the sternum.

After a hospital stay of some thirty-nine days, the plaintiff made a recovery sufficiently complete to return to light duty as a flagman in April of 1964, and to the heavier duties of his original employment as a brakeman in September of 1964. He continued to work regularly through 1965 and until September of 1966, when he suffered a coronary occlusion, followed by a second attack in January of 1967.

Fuhrman did not work for the Railroad after September of 1966 although he said that he tried to go back to work in June of 1967 despite some continuing shortness of breath and soreness in his right shoulder. While his own physician had indicated it was all right to try work as a brakeman, according to the plaintiff the Railroad doctor thought "yardwork would be too tough." Although the company did feel that the plaintiff could handle a flagman's job, seniority apparently was an obstacle to obtaining that position, and in November of 1968 Fuhrman became a maintenance man at an annual salary of $2,000 plus free rental of an apartment in the building where he was employed.

The claim for lost wages suffered during the few months immediately following the fall in December of 1963 amounted to $1,829.77 but, by the day of trial, the time lost after the first heart attack had increased the figure to $16,-388.

There was also a claim for impairment of future earning capacity and an actuary, one Leonard Goodfarb, produced calculations to show that the present worth of anticipated future earnings at the rate of $7,200 per annum,[4] projected to the age of 65 and 70 at 4% were respectively $60,779 and $91,902.

The jury verdict was in the amount of $109,928, only a few hundred dollars more than the sum of the actuary's calculated loss of $91,902 plus the lost wages to date of trial of $16,388 and medical expenses of $1,941.

It is clear, therefore, that the actuary's testimony carried much weight with the jury. Failure to support his opinion and calculations with sufficient data of record to support the conclusions is obviously an omission which cannot be overlooked or minimized.

Goodfarb's calculations and testimony were based on total and permanent disability of the plaintiff. Since the injuries apparent in 1963 and 1964 did not have such an effect, it was essential that the plaintiff establish that the heart attacks in 1966 and 1967 were caused by the original accident and that the coronary occlusions resulted in total and permanent disability. A careful search of the record fails to reveal any support for the latter premise.

Dr. H. R. Weidaw, the physician who treated the plaintiff for his heart attacks, when called as a witness by the defendant, professed to be unable to establish a connection between the injuries received in 1963 and the heart condition as found in 1966. However, the plaintiff produced Dr. David Gelfand, a specialist in cardiology who first examined the plaintiff in 1968 for the purpose of appearing as a witness at the trial. This expert witness did give his opinion that there was causation and in most circumstances the resolution of this conflict would be a jury question.

However, neither Doctor Gelfand nor Doctor Weidaw testified that the plaintiff had a permanent disability which

4. In the year 1965 Fuhrman earned $7,100 as a brakeman and there had been raises granted between that time and the trial.

would prevent his returning to work at his former position with the Railroad, nor did they give any estimate as to what might be the extent of any permanent partial disability.

It is true that Dr. Oscar Corn, an orthopedic specialist also called by the plaintiff as an expert, felt that Fuhrman had a permanent residual limitation of motion in his right shoulder but it seems clear that this did not prevent resumption of duties as a brakeman.

It is important, also, to realize that the plaintiff's ability to carry out the duties of a maintenance man established that he had some capabilities of employment and did not suffer from a total deprivation of earning power. Permitting the expert to project earnings based on the unsubstantiated and faulty premise of total deprivation of earnings in the future could not but mislead the jury as to the area within which they should deliberate in order to arrive at fair compensation for the actual loss suffered.

█ Another unsatisfactory aspect of the damage phase of this case is the fact that the jury was permitted to award medical expenses to the plaintiff even though they had in fact been paid by the defendant. In his brief and at oral argument in this Court, plaintiff's counsel conceded that he erred in urging that proposition upon the lower court. In Wagner v. Reading Company,[5] we held that it was not proper to permit recovery of medical expenses under similar circumstances.

The defendant argues that it was deprived of a fair trial because of the manner in which the trial was conducted by the District Judge and his failure to regulate the conduct of plaintiff's counsel. The record reveals a trial which was marred by bickering between counsel and some exchanges between counsel and the Trial Judge which were discourteous in the least, if not actually disre-

spectful, all of which occurred in the presence of the jury and may have influenced the amount of the verdict. It may well be that the atmosphere of the trial was not conducive to a dispassionate and objective study of the evidence in the case. We do reject, however, any inference that the Trial Judge was responsible for this condition.

Trial time was wasted in a number of instances by unjustified refusal to stipulate to uncontroverted and simple factual matters or lengthy delay before actually coming to an agreement on some issues. The technique of counsel in this case of contesting non-decisive issues belongs to another era—one which perhaps could afford a leisurely trial at the pleasure of the attorneys.

Defendant complains of many instances of the use of leading questions by plaintiff's counsel. We are inclined to consider this a result of inexperience but find that the objections were properly ruled upon by the Trial Judge. In the main, the questions were harmless and not worth the time devoted to objection and argument on them but we assume that at the retrial, counsel for the plaintiff will be more careful in his interrogation.

█ Since the matter must be remanded for a new trial on damages, we point out that the studied and continued attempts to introduce evidence of the amount of the plaintiff's disability pension being received from the Railroad Retirement Board should not take place again. This is not admissible evidence in a case of this nature. Eichel v. New York Central Railroad;[6] Mahon v. Reading Company.[7]

█ At the urging of defense counsel, the Trial Judge charged that the jury should use an interest rate of 6% in computing the net worth of future earnings. This is proper under Pennsyl-

5. 428 F.2d 289 (3rd Cir. 1970).

6. 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963).

7. 367 F.2d 25 (3rd Cir. 1966).

vania law but is not correct for a case under the FELA. The Supreme Court has pointed out[8] that the discount allowable should be that which can be obtained upon investments in safe securities and that the beneficiaries are not required to have special skills to increase the yield beyond that point. This, obviously, is a matter for the jury to determine. In many FELA cases counsel for the parties have been able to stipulate to a rate of interest satisfactory to both sides. It is difficult to understand why it could not be done in this case also.

There was lengthy discussion in the record about the admissibility of hospital records. The issue was thoroughly considered by this Court in the recent case of Rivers v. Union Carbide Corporation,[9] reaffirming previous rulings of this Court which allowed such records into evidence. The Trial Judge properly ruled upon this question.

Defendant also complains that the medical experts consulted by the plaintiff for purposes of testimony only should not have been permitted to express an opinion based upon a history furnished by the plaintiff. Since the plaintiff himself testified to this very same material during the trial and was available for cross-examination, it is difficult to understand the position of the defense. The plaintiff's history to which he testified in court was no longer hearsay and the Trial Judge properly ruled that the medical experts could express an opinion based on this factual data.

During the cross-examination of the actuary by defense counsel, the court refused to permit questioning on the matter of existence of work expectancy tables and other statistical matter, other than the United States Life Expectancy Table which had been admitted into evidence, on the ground that defense counsel did not have such tables available in court. While wide latitude must be granted on cross-examination, we feel that the action of the Trial Judge was proper to insure that the interrogation was kept within proper bounds and that suitable evidence to establish the basis for the inquiry would be available to the jury. The technique of planting ideas in a jury's mind through questions on cross-examination which are never followed up by introduction of appropriate evidence is well known and should be controlled by the Trial Judge. Counsel for the defendant did not even offer to produce such tables at a future time in the trial and we therefore affirm the action of the Trial Court in this respect.

Interrogatories were submitted to the jury which found that the plaintiff was not guilty of contributory negligence. Since the record justifies the jury's findings of negligence and the absence of fault on the part of the plaintiff, the damage portion of the judgment of March 4, 1969 will be vacated and the cause remanded for a new trial solely on the issue of damages in accordance with the foregoing opinion.

8. Chesapeake & Ohio Railroad v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916).

9. 426 F.2d 633 (3rd Cir. 1970). *See also* Johnson v. Mississippi Valley Barge Line Co., 335 F.2d 904 (3rd Cir. 1964) ; Bartkoski v. Pittsburgh & Lake Erie Railroad, 172 F.2d 1007 (3rd Cir. 1949) ; *See also* the thorough discussion of the problem in Thomas v. Hogan, 308 F.2d 355 (4th Cir. 1962).