VICTOR HERMAN and COMMISSIONER OF LABOR, GOVERN-MENT OF THE VIRGIN ISLANDS, MELVILLE STEVENS, Subrogee of VICTOR HERMAN, Civil No. 222-72;

THOMAS CHERUBIN and ROMA CHERUBIN and the COM-MISSIONER OF LABOR, Subrogee of THOMAS CHERUBIN, Civil No. 223-72;

FRANKLIN HODGE and COMMISSIONER OF LABOR, GOV-ERNMENT OF THE VIRGIN ISLANDS, MELVILLE STEVENS, Subrogee of Franklin, Civil No. 224-72;

SYLVESTER MATTHEW and COMMISSIONER OF LABOR, GOVERNMENT OF THE VIRGIN ISLANDS, MELVILLE STEVENS, Subrogee of SYLVESTER MATTHEW, Civil No. 510-72;

WILFRED CHASE and the COMMISSIONER OF LABOR, Subrogee of WILFRED CHASE, Civil No. 512-72;

MATTHEW BAPTISTE and COMMISSIONER OF LABOR, GOVERNMENT OF THE VIRGIN ISLANDS, MELVILLE STEVENS, Subrogee of MATTHEW BAPTISTE, Civil No. 513-72, Plaintiffs

v.

HESS OIL VIRGIN ISLANDS CORPORATION and CHICAGO BRIDGE & IRON COMPANY, LTD., Defendants

HESS OIL VIRGIN ISLANDS CORPORATION, FEDERAL INSURANCE COMPANY and INSURANCE COMPANY OF NORTH AMERICA, as Subrogees of HESS OIL VIRGIN ISLANDS CORPORATION, Civil No. 598-72, Plaintiffs

v.

CHICAGO BRIDGE & IRON COMPANY, LTD., Defendant

District Court of the Virgin Islands

Div. of St. Croix

July 30, 1974

J. MICHAEL SPENCER, Frederiksted, St. Croix, V.I., *for plaintiffs* (222-72 through 513-72)

BIRCH, DEJONGH & FARRELLY (ALEXANDER A. FARRELLY, of counsel), Charlotte Amalie, St. Thomas, V.I., *for plaintiffs* (598-72)

BIRCH, DEJONGH & FARRELLY, ESQS. (ALEXANDER A. FARRELLY, of counsel), Charlotte Amalie, St. Thomas, V.I., *for defendants* (222-72 through 513-72)

BAILEY, WOOD & ROSENBERG, ESQS. (WILLIAM BAILEY, of counsel), Charlotte Amalie, St. Thomas, V.I., *for defendant* (598-72)

YOUNG, *District Judge*

## MEMORANDUM OPINION AND ORDER

A lengthy trial was held in these consolidated actions for personal injuries of six workmen and for property damage to a petroleum storage tank and its product contents which resulted from an explosion and fire at the Hess Oil Virgin Islands Corp. ("Hess") refinery on St. Croix. On April 4, 1974, the jury returned a verdict in favor of the

six personal injury plaintiffs against Chicago Bridge and Iron Company, Ltd. (CBI), in the total amount of $13,295,000.00. The jury also returned a verdict against CBI and in favor of Hess on its complaint for property damage in an amount agreed upon in the event liability was so found. Thereafter, CBI filed motions for judgment notwithstanding the verdicts and for a new trial as to both personal injury and property damage awards. The personal injury plaintiffs filed similar motions based on the jury's failure to return a verdict against Hess.[1] Extensive briefs have been filed and comprehensive oral arguments were made by all counsel on July 3, 1974.

■ The numerous issues raised by the motions are now ripe for decision and I will discuss the more substantial arguments in this opinion. Because so many points have been mentioned in the motions and briefs which I consider to be without any merit, I do not consider it necessary to deal with every alleged "error" identified by defendant CBI.[2] However, I will deal with some of these insubstantial issues in general terms. The remainder which are not referred to specifically may be considered, if erroneous at all, to be either harmless or simply frivolous.

------

[1] Plaintiffs neither briefed nor argued these motions. However, some arguments of defendant CBI are directed to the evidence tending to establish the liability of Hess. Therefore, although the motions are not strenuously sponsored by the movants, I will not disregard them. Nonetheless, for reasons which will be explored more fully herein, I must deny the relief requested.

[2] For example, CBI argues that it was denied a fair trial by reason of pretrial publicity. Only one potentially prejudicial newspaper article appeared, and it did not mention CBI. Moreover, a thorough voir dire examination eliminated veniremen who may have read the article and were influenced by it. The further argument concerning two jurors who were excused during the trial is similarly without merit. The jurors were excused with the knowledge of all counsel, none of whom requested that the remaining jurors be questioned about information they may have received from the removed jurors. Indeed, it was the opinion of all parties that the removals should be handled in such a way that the rest of the jurors would not suspect the reasons for the action, or speculate that any party had been guilty of misconduct during the trial.

■ CBI argues that judgment n.o.v. should be granted because plaintiff failed to present sufficient evidence to allow the jury to conclude that it was negligent and that such negligence was a proximate cause of the explosion. Alternatively, it is argued that a new trial should be ordered because the verdict was against the weight of the evidence. In evaluating these contentions, my review of the evidence is necessarily limited because plaintiffs have a constitutional right to trial by jury. I cannot set aside a verdict and order a new trial simply because I would have come to a different conclusion had I been the trier of fact. Lind v. Schenley Industries, Inc., 278 F.2d 79, 91 (3rd Cir. 1960). Unless I am convinced that the jury reached a seriously erroneous result because its verdict was against the clear weight of the evidence, I have no discretion to order a new trial. And certainly if the verdict is not against the weight of the evidence, the more rigorous standard for granting a judgment notwithstanding the verdict is unsatisfied.

I have concluded that the evidence of negligence on the part of CBI was more than sufficient to support a verdict in favor of plaintiffs. Moreover, I think that the clear weight of the evidence leans toward liability. Even if I were to assume the role of a thirteenth juror, I would find for plaintiffs and against defendant CBI. The arguments of CBI to the contrary are based on an unnecessarily narrow theory of liability and a severely one-sided view of the inferences which can be drawn from undisputed evidence.

CBI maintains that plaintiffs' theory of liability, upon which their case must stand or fall, was ignition of fumes in the downcomer through a gap in the blind by sparks from a welding rod. It is then argued that no evidence was presented from which a jury could conclude either that

fumes were present or that there was a gap. If plaintiffs were required to rely upon this one theory of ignition,[3] I would still find ample evidence to support it. The mere fact that a blind is used at the downcomer opening is an indication that most construction personnel recognize the possibility that fumes will be present. The glass diaphragm in the foam chamber is not a construction safety device and is actually designed to break easily when fire-fighting equipment pressurizes liquids up the downcomer to create foam for dispersal into the upper reaches of the tank. Therefore, at any time and on any downcomer, one knows that there is at least a possibility that fumes will be present. There is undisputed evidence that the glass diaphragm on an adjacent downcomer was missing on the day before the explosion and that fumes were escaping in easily detectable proportions from that downcomer. Furthermore, workers in the area heard a noise shortly before the explosion which the jury could believe was caused by the passage of a flame front up the downcomer. From this admittedly circumstantial evidence, the jury could well conclude that fumes were present in the downcomer which was being welded upon at the time of the explosion.

The evidence of a gap between the blind and the downcomer flange is even stronger. It is undisputed that Mr. Burton loosened the nuts holding the blind in place. The jury could infer that this resulted in a loose and ineffective blind. It is suggested, but not persuasively so, that it was not necessary to loosen all of the nuts in order to adjust the lug holes of the blind to align with those of the flanges

---

[3] Of course, plaintiffs are not so limited. Although the theory which CBI attacks was plaintiffs' principal explanation for the fire and explosion, several alternative theories were advanced which would also support liability—the electrical charge through the tank as a result of improper connection of welding leads and the policy decision by CBI's Coral Gables office to undertake a highly hazardous job of installing by welding method a network of vertical and horizontal pipes on petroleum tanks containing volatile product.

above and below. The fact that Mr. Burton tightened the nuts afterwards would not be conclusive on the jury that the blind was, in fact, restored to the same gas-tight security position that it was presumably in before the adjustment. Finally, the presence of a gap after the explosion is evidence from which a jury could infer that an opening was present just prior to the fire. The argument that the gap was caused by the heat of the fire is against the weight of the evidence negating any exposure of that particular downcomer and welding area to extreme heat. The welding leads, scaffold and paint in that area were not scorched or severely damaged, suggesting that the heat at the blind was not excessive to the degree where it would cause a gap.

██ In short, I find sufficient evidence to support plaintiffs' theory of ignition and, if the explosion occurred in that manner, find ample evidence of CBI's negligence upon which to base the verdict. The jury could find that CBI did not adequately blind all sources of pressure, failed to supervise its welders and failed to test for the presence of fumes. Each of these acts of negligence could be a proximate cause of the explosion. Therefore, CBI's motions for a judgment notwithstanding the verdicts and a new trial on grounds of insufficiency or weight of the evidence will be denied.

### EVIDENCE OF HESS' NEGLIGENCE

Although the evidence of negligence on the part of defendant Hess was not as substantial as that concerning CBI, it was sufficient to go to the jury. Plaintiffs argued that Hess was negligent in permitting welding to be done on Tank 7447 with product in it, in not checking the blinds more carefully and more often for escaping fumes, and in not inspecting the glass diaphragms. Furthermore, the jury could have found in favor of the personal injury plaintiffs and against Hess on the basis of CBI's negligence if it

concluded that Hess should have recognized that the welding created a peculiar risk of physical harm to others, or if it concluded that Hess retained a right of control and failed to exercise it reasonably.

■ This evidence of negligence and these possible findings which the jury could have made will not support entry of a judgment n.o.v. against Hess and in favor of plaintiffs. Viewing the evidence in a light most favorable to Hess, the jury could easily conclude that no negligence was present and no liability was warranted. There was evidence that welding could be done safely on tanks with product in them if certain precautions were taken. There was evidence that Hess thought these precautions were being taken, partly by it (through early morning sniffer tests) and partly by CBI (by blinding all sources of pressure). There was evidence that peculiar risks of harm were not presented if precautions were taken and there was evidence that the performance of the welding work was in CBI's hands alone, with no right of control retained by Hess.

Whether the verdict in favor of Hess and against plaintiffs was against the weight of the evidence is a more difficult question. There were sharp conflicts in the testimony on each of the critical issues. If I felt free merely to substitute my judgment for that of the jury, I would grant a new trial because I would resolve some of the disputed issues in favor of plaintiffs. However, I know that I must defer to the collective wisdom of the jury which heard the same testimony and came to a different conclusion. I do not have the kind of definite and firm conviction that a mistake has been made which would justify the exercise of my discretion to grant a new trial. Therefore, plaintiffs' motion for judgment n.o.v. or a new trial against Hess will be denied.

CBI contends that reversible error was committed because the court's instructions to the jury were not sufficiently detailed in that they failed to relate the relevant law to specific evidence presented during the trial. Because no objection on this ground was made during the trial, CBI further argues that the asserted deficiencies in the instructions were "plain error." In view of the care which was taken in composing the instructions and the numerous opportunities which were afforded counsel for CBI to propose instructions, it is unfortunate that this argument is presented to the court now. However, I will examine the charge carefully in order to determine whether the objections of CBI are meritorious and can be raised at this time.

■ The only portion of the charge which is questioned is that dealing with the duties which Hess owed to the personal injury plaintiffs. It is not argued that these duties were misstated, nor are there any additional duties which CBI feels should have been included. Instead, defendant asserts that it was error not to have explained the phrases "right to control" and "peculiar risk of physical harm" which were used in defining Hess' duties as employer of an independent contractor. I will assume first that the plain error rule can apply to an objection of this type[4] and will consider the argument on its merits.

The real issue presented is whether the phrases used are the kind of "bare legal abstractions" which a jury cannot be allowed to consider without a contemporaneous recitation by the court of the evidence having to do with the terms. I do not think that a full review of the relevant evidence on these questions was necessary and therefore conclude that the instructions on Hess' duties were not plain

---

[4] See, Choy v. Bouchelle, 436 F.2d 319 (3rd Cir. 1970).

error requiring a new trial. Neither phrase includes words unfamiliar to laymen which would have to be carefully explained to the jury; nor do the terms have special meanings when used in the law to define a defendant's duties. Therefore, a jury does not require special guidance in order to understand which evidence relates to the phrases. This is especially true in a lengthy trial such as the one conducted here because the attorneys for CBI consistently emphasized the evidence tending to show that Hess retained a right to control the activities of CBI. I do not think it was possible for the jury to confuse the right to control with the actual exercise of control, either from the instruction given or from the way in which counsel presented the evidence and structured their cases. The decision whether a "peculiar risk of physical harm" was presented by the activities which took place at the refinery is one which the jury alone can make. It requires an evaluation of the evidence by the jury which should not be unnecessarily influenced by the views of the court as to what risks are peculiar and why.

 But even assuming that a more complete summary of relevant evidence would have been appropriate, I do not think a new trial should be granted because of the way in which the final charge was composed and CBI's participation in the decision to abbreviate any reference to the facts. All parties were asked to submit proposed jury instructions well before the conclusion of the evidence. Interim Trial Order, March 14, 1974. A few brief instructions were submitted by CBI. Plaintiffs submitted a lengthy charge which included a detailed summary of the evidence which they felt supported a verdict against both Hess and CBI. These instructions were incorporated in the Court's Proposed Jury Instructions which were given to all counsel before the first jury instructions conference. At that conference, CBI expressed the view that the court should not review the evidence of negligence in the instructions. Al-

though plaintiffs were anxious to have the court relate the instructions on the law to the facts of the case, they agreed to the deletion of the factual contentions of negligence and accepted CBI's suggestion that the facts could be fully developed for the jury by the attorneys in their final arguments. The instructions on Hess' special duties (which utilized the "control" and "peculiar harm" phrases) were handled in a similar way, with the understanding that the Court would not recite the relevant evidence but would rely on counsel to review it for the jurors. Therefore, not only was there no objection to the decision to abbreviate the charge, it was done at the request of CBI. If it is possible to waive the objection defendant now raises, I feel that CBI did so by taking the position it did during the jury instructions conference.

The only remaining "error" in the instructions upon which CBI bases its motion for a new trial is that part of the charge which refers to CBI as an independent contractor. This conclusion was never disputed by CBI during the trial and no objection to the reference in the instructions was made at any time. Indeed on the evidence presented there simply could be no doubt that CBI was an independent contractor. Even now, CBI recognizes that it was an independent contractor by arguing that Hess' duties should be defined in terms of an employer-independent contractor relationship. CBI Brief p. 21. In view of the evidence and CBI's position at the trial, I conclude that the instructions were correct and certainly do not support the arguments for a new trial.

### Evidence of Past and Future Wage Loss

In order to support their claims for loss of future wages, plaintiffs offered the testimony of an economist, Dr. Huddle. CBI objected at the beginning of his testimony on the ground that any evidence he might present

533

would be speculative and conjectural. I overruled the objection because prospective damages are always based to some extent, on probabilities and I felt that, by using an economist, plaintiffs were attempting to establish their damages with as much certainty and accuracy as possible. See, Russell v. City of Wildwood, 428 F.2d 1176 (3rd Cir. 1970). Because CBI did not dispute Dr. Huddle's expert qualifications, it seemed best to allow him to testify and to consider specific objections to the content of his testimony as they were made. However, the only objections which were made during the trial came firstly in the form of a motion to strike Dr. Huddle's testimony raising two issues: whether use of a productivity wage increase factor was permissible and whether a discount rate excluding inflation could be considered by the jury. I denied the motion to strike by an order dated April 3, 1974. The considerations which influenced my decision then are equally persuasive now and require that CBI's motion for a new trial on the basis of these two questions be denied.

The remaining attacks on Dr. Huddle's testimony were raised for the first time in CBI's motion for a new trial. Because I do not feel that any of the objections can constitute "plain error" I will not deal with them at length. The discussion in plaintiffs' brief of each of the new points raised by CBI reveals weakness in most of the arguments leveled at Dr. Huddle. For example, the assumption of total disability for four plaintiffs was not unfounded but rather was supported by medical testimony, evidence of prior work efforts which had failed and uncontradicted testimony that the men were not presently employed. CBI's reliance on Fuhrman v. Reading Co., 439 F.2d 10 (3rd Cir. 1971) (where the plaintiff was working at the time of trial) is therefore misplaced.

Finally, it is probably true that plaintiffs' evidence of future wage losses was responsible, in part, for the large

verdict returned by the jury. If Dr. Huddle had been more thoroughly cross-examined or if CBI had called its own economist to argue for a conservative calculation of future wages, the compensatory damages awarded to plaintiffs might have been lower. But these questions of trial tactics cannot be corrected at this stage of the proceedings by offering new economic evidence or by making persuasive jury arguments to the court. CBI did not actively dispute plaintiffs' damages during the trial or at final argument. The fact that substantial damages may have been awarded as a consequence of this strategy is not a ground for granting a new trial.

### Compensatory Damage Award

 CBI argues that, even if the economic testimony was proper, the compensatory verdicts "were outrageously and shockingly excessive" and a new trial should be granted for that reason alone. It is asserted that the damages must have been based on counsels' inflammatory appeals to the passions and prejudices of the jury. If I felt that this were the case—that the verdict was a result of prejudice rather than a consideration of plaintiffs' serious injuries—I would grant the relief requested. But I simply cannot agree with CBI's contention. This trial dealt with a very tragic incident and plaintiffs were fortunate to be represented by zealous counsel. The examination of witnesses and closing arguments did not always proceed in the dispassionate manner which one might expect to encounter in a technical tax case. But I do not think that the conduct of counsel was ever intended to appeal to the prejudices of jurors. Nor do I think that the verdict was the result of any prejudice which might unintentionally have been engendered. Rather I think it was the jury's reaction to evidence of the horrible pain, suffering and loss of enjoyment of life which these men have undergone and will

535

have to face in the future. Plaintiffs correctly argue that the awards of juries in other cases are of little relevance when deciding if these damages are excessive. Plaintiffs were entitled to a trial by jury and to this jury's assessment of their losses. However, it is useful to note that other courts and juries have arrived at similarly substantial verdicts which were not considered excessive or the product of prejudice. See, Wry v. Dial, 503 P.2d 979 (Ariz. 1973); General Electric Co. v. Bush, 398 P.2d 366 (Nev. 1972).

### Punitive Damage Award

In addition to the substantial compensatory damages already discussed, the jury awarded the personal injury plaintiffs punitive damages in the amount of five million dollars. CBI argues that this award cannot stand because it is inconsistent with the jury's answer to a special verdict question, because it was the result of prejudice and because it is outrageously excessive.

The issue of an apparent inconsistency on the verdict form has its background in the decision, on motion of defendant CBI, to consolidate the personal injury cases and Hess' property damage claim against CBI. Neither Hess nor CBI ever contended that the personal injury plaintiffs were contributorily negligent. In the property damage case, however, CBI always maintained that if it was negligent, Hess was also, and should be barred from recovering for the loss of the tank. Because contributory negligence was a critical issue in the property case, and because the possibility that either Hess or CBI would be found grossly negligent would affect the contributory negligence bar, it was necessary to obtain a determination from the jury as to the ordinary and gross negligence of each party. At one point in the trial, it was suggested that the court could merely refer to the general personal injury verdict to determine whether either defendant was negligent and to the

decision on punitive damages to decide the property damage case accordingly. CBI argued against this procedure on the ground that, in the context of risk to human life, a jury might view certain conduct as reckless whereas the same conduct endangering only property might not constitute gross negligence. Because of this subtle distinction, it was decided that the jury would be asked to answer separate special verdict questions about the ordinary and gross negligence of each party to the property damage case.

■■■ The jury found that CBI's conduct constituted negligence as to Hess' property but did not constitute reckless disregard for the safety of that property. Are these answers inconsistent with the jury's award of punitive damages against CBI in the personal injury case? I think not for several reasons. First, although the cases were consolidated, they are separate actions and findings from one should not influence the result in the other. Second, there is a rational explanation, first articulated by counsel for CBI, for coming to a different conclusion about the character of a defendant's acts when human life is at stake than when mere property is at issue. Finally, in accepting this explanation for the apparent inconsistency I note the suggestion in Julien J. Studley, Inc. v. Gulf Oil Corp., 407 F.2d 521, 526 (2d Cir. 1969), that wherever possible, courts should harmonize the jury's several pronouncements "rather than use the answers to special questions as weapons for destroying the general verdict."

■■■ The second ground upon which CBI attacks the punitive damage award—that it was the product of prejudice—has already been discussed by me in connection with compensatory damages. It is true that the arguments in support of punitive damages tended to concentrate on the reckless character of the conduct in question, rather than the damages it caused, resulting in a more heated presenta-

tion to the jury, but this is inherent in the nature of punitive damages. In attempting to convince a jury that a defendant's conduct was outrageous and should be punished,[5] an advocate must go beyond the kind of arguments necessary to establish ordinary negligence. However, if no improper appeals to the jury's prejudices are made (and I find none here), there is no reason to upset the decision to award punitive damages.

The final contention of CBI—that the amount of the punitive damage award was outrageously excessive—is subject to different considerations. On the evidence presented, I feel that the jury could well conclude that CBI's conduct was indicative of a reckless indifference to the interests of the personal injury plaintiffs and that punitive damages were warranted. But even outrageous conduct will not support an oppressive or patently excessive award of damages. The amount awarded should be related to the wealth of the defendant, because the sum necessary to punish or deter will vary with the financial situation of the wrongdoer.

It is obvious that the jury in this case made no effort to arrive at a punitive damage award which was rational, in light of CBI's resources. In awarding five million dollars, the jury apparently accepted plaintiffs' counsel's argument that an amount of this magnitude was necessary to deter a company as large as CBI, with offices around the world. But the size of CBI's parent company should not be relevant when assessing damages against CBI. The financial statement (plaintiffs' exhibit 46) of

---

[5] The suggestion that CBI's conduct could not possibly support such arguments ignores the substantial evidence of reckless conduct presented at the trial. Although every person in a position of authority with CBI at the Hess refinery thought that the procedure being utilized was unsafe, and despite a communication of these concerns to the company's head office in Coral Gables, Florida, CBI's policy was to continue the work despite the hazard and without providing any special training or safety precautions for its welders.

CBI which was admitted into evidence should have been the jury's guide when they sought to arrive at a sum for punitive damages. I believe that none of the individual jurors took the time nor the trouble to peruse the financial statements of CBI which plaintiffs offered into evidence. Neither plaintiffs nor defendant CBI referred to these statements in final arguments and therefore, save for the court's instructions on the law that an award of punitive damages should be determined in light of the punitive defendant's wealth, there was no guiding argument leading the jurors to the pertinent financial exhibits. I surmise, especially from the comments made by counsel in the side bar colloquy when plaintiffs made an unsuccessful attempt to enter into evidence an earlier and more affluent financial statement, that plaintiffs were avoiding reference to the latest and less affluent financial statement to avoid an obvious upper limit to the amount being asked for and that defendant CBI made no reference to the financial statements to avoid any invitation to award punitive damages at all and more particularly to avoid any figure that might be suggested by the net worth of that latest financial statement. The balance sheet reveals a net worth of about 3.5 million dollars; the income Statement shows net income slightly in excess of 1 3/4 million. Given these figures, a punitive damage award of 5 million dollars is shocking and patently excessive. CBI is correct in arguing that such an oppressive verdict is a sound basis for granting a new trial. However, rather than grant a new trial on all issues, I will deny CBI's motion on the condition that plaintiffs file a remittitur.

The proper amount which should be remitted is probably the most difficult question confronting me. I cannot merely substitute my opinion as to the appropriate sum without infringing upon plaintiffs' constitutional right to trial by jury. Since it is my belief that the jury did not relate the

amount awarded to defendant's wealth, I must view the excessive award as an expression by the jury that it deems that punishment and deterrence are the goals to be accomplished by any award. The figure that the jury set was close to that suggested by the plaintiffs' counsel in final argument. There was no reasonable counter suggestion by CBI, other than zero dollars. Under the circumstances, I do not feel that my suggestion of a reasonable figure will be an unwarranted infringement upon plaintiffs' right to have the jury's determination so long as the figure which I suggest will tend to accomplish, without excessiveness, the same goals which I believe the jury had in mind. I have concluded that this reasonable figure is one million dollars. It is my opinion that an amount in seven digits is substantial and being substantial, it will accomplish deterrence and at the same time, it avoids excessive punishment. Therefore, CBI's motion for a new trial will be denied on the condition that plaintiffs file a remittitur in the amount of four million dollars.

## Admission of Evidence

CBI's final argument in support of its motion for a new trial is based upon a large variety of alleged errors committed during the trial in connection with the admission of evidence, the presentation of testimony, and the conduct of counsel during arguments to the jury. I will discuss some of these contentions but will not attempt to deal with every point in detail.

The first category of error identified by CBI is the extensive use of leading questions during the trial. I do not consider the leading questions utilized in this case grossly improper, as CBI urges, nor do I think they warrant a new trial, either when considered alone or together with other alleged trial errors. The court often sustained CBI's objections to leading questions but on most occasions

no objection was appropriate and none was made. Many of the witnesses who were led by counsel were called as adverse witnesses under the managing agent section of Federal Rule of Civil Procedure 43 (b). CBI did not object to this treatment by plaintiffs supervisory personnel of the defendants and, in most cases, the procedure was proper, given the liberal construction of the managing agent term adopted by many courts. Some witnesses, such as Mr. Carll, were openly hostile and leading questions were clearly appropriate. Therefore, there was a basis in the rules for plaintiffs and Hess (as plaintiff in the property case) to use leading questions when examining most of the witnesses referred to by CBI.

In addition to the authority of Rule 43 (b), I do not think that the leading questions in this case warrant a new trial because, even if it was occasionally improper, it was harmless. This was a lengthy trial which was proceeded by extensive depositions. In most cases, counsel were merely seeking to have witnesses repeat testimony previously elicited during discovery. Therefore, rather than putting words in the witnesses' mouths or suggesting desirable answers, attorneys were only trying to speed the presentation of evidence which probably would have been forthcoming in any event. I am unwilling to discourage such efficient trial procedures unless I feel that some prejudice to opposing parties is involved. Because I see no such prejudice, I will not grant a new trial on the ground that many leading questions were asked.

CBI's arguments about the use of depositions, restrictions on cross-examination, opinion evidence by laymen and comments by the Court during trial will not support the motion for a new trial. Some of these matters were not handled with textbook precision during the trial. However, the Court rarely had the benefit of objections by counsel so that the issues could be ruled upon, or corrective instruc-

tions given. In any event, none of the possible errors cited by CBI rise to the level of plain error and none seem to me to have substantially prejudiced CBI or interfered with its right to a fair trial.

The contention that counsel for plaintiffs and Hess made many improper comments while examining witnesses and during closing arguments does not merit the relief requested either. As I have already stated, this trial was hotly contested and counsel for all parties probably made comments which, upon reflection, would have been better left unsaid. However, because an issue in the case was whether the defendants acted outrageously and should be punished for their conduct, the evidence which had to be developed and the arguments which had to be directed to the jury were necessarily more forceful than in a simple negligence case.

 CBI's final argument is that a new trial should be granted because certain exhibits not admitted into evidence were inadvertently sent into the jury room during deliberation. Although it was clearly error to allow the jury to see documents which were not evidence in the case, I have concluded that the error was entirely harmless insofar as CBI is concerned and created no prejudice which might warrant a new trial. Two of the exhibits were offered by CBI itself and cannot have been detrimental to its case. The remainder of the exhibits were offered by Hess and were excluded by the court, not because they were prejudicial to CBI, but because they were irrelevant as they dealt with the agreements concerning the construction of the refinery's tanks, rather than foam piping work. Only Hess exhibit R, a blank CBI safe work order, was at all relevant to the case and there is no indication that it could prejudice the interests of CBI.

In addition to the harmless character of the exhibits, the court's independent conclusion that no prejudice re-

sulted was reinforced by the colloquy with the jury which took place shortly after the error was discovered. With the knowledge of all counsel, the court decided to treat the unadmitted exhibit incident as a case of possible "outside influence" on the jury deliberations. Therefore, the jury was questioned, not to examine the effect of any documents on their deliberations, but to determine whether any outside influence (the unadmitted exhibits) had been brought to bear on the jury. The colloquy revealed that the majority of the exhibits in question were not observed by the jury. Although it developed that at least a few jurors saw one of the exhibits, it was abundantly clear that no prejudice to CBI resulted and that the document did not affect the deliberations in any material way. Therefore, CBI's motion for a new trial on the ground that unadmitted exhibits entered the jury room must be denied.

## ORDER

For the reasons stated in the above Memorandum Opinion, it is hereby ORDERED that:

1. Plaintiffs' motion for judgment notwithstanding the verdict or a new trial against defendant Hess be DENIED.

2. CBI's motion for judgment notwithstanding the verdict be DENIED.

3. CBI's motion for a new trial be DENIED on the condition that plaintiffs file a remittitur of the punitive damage award in the amount of four million dollars, such remittitur to be filed within 30 days.