**Ida Mary LEWIS, Appellant,**

v.

**UNIVERSITY OF PITTSBURGH and University of Pittsburgh Book Center.**

**No. 83–5052.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Sept. 14, 1983.

Decided Dec. 30, 1983.

Rehearing and Rehearing In Banc Denied Feb. 9, 1984.

---

James H. Logan, Pittsburgh, Pa., for appellant.

Lynn E. Wagner, Vasilis C. Katsafanas, Berkman, Ruslander, Pohl, Lieber & Engel, Pittsburgh, Pa., for appellees.

Before ADAMS, HUNTER, and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

Plaintiff Ida Mary Lewis brought suit against the University of Pittsburgh and its Bookstore under section 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 (1976), and under 42 U.S.C. §§ 1981, 1983 (1976), claiming that she was denied a promotion because of her race. Her claims under sections 1981 and 1983 were heard by a jury, and her Title VII claim was decided in a bench trial by the district court judge. Both factfinders found for defendants on the merits. We affirm.

### I.

Ida Mary Lewis, a black woman, has been employed at the Book Center of the University of Pittsburgh since 1965. In 1967, she was promoted from clerk to Buyer in the Trade Book Department. She again became a clerk in 1975 when one Buyer position in the Trade Book Department was eliminated in a budgetary move.[1]

In October, 1976, Lewis applied for a vacant position as Assistant Buyer in the Trade Book Department. The position instead went to Jean Aiello, a white woman who had been employed with the Bookstore since 1972. Lewis alleged that she was better qualified for the position than Aiello and that the reason she was denied promotion was because she is black.

As the district court findings reveal, Lewis was 58 years old, had graduated from Perry High School in 1942, and from Carnegie Institute of Technology (now Carnegie Mellon University) in 1947 with a Bachelor's degree in History and English. She then enrolled at the University of Pittsburgh, receiving her Master's degree in History in 1950. She returned to Carnegie in 1961 and received a Master's degree in Library Science. In the fall of 1964, Ms. Lewis began studying for her Ph.D. in History. She was forced to abandon that plan, however, due to lack of finances and the illness of her parents.

Ms. Aiello, on the other hand, graduated from high school in 1970. Following graduation, she enrolled in the University of Pittsburgh for two years, but had to withdraw for financial reasons. Ms. Lewis had previous experience as a Buyer, while Aiello worked at the Book Center as a sales clerk.

The defendants contended that Lewis was denied the position as Assistant Buyer because she had a poor history of work habits, bookkeeping, and inventory control practices. These contentions were supported by the testimony of Russell Kierzkowski and Dwight Fong, the two current Buyers for the Trade Book Department. Kierzkowski stated that, when Lewis had previously been a Buyer (prior to 1975), Lewis had neglected to return unused books to the publishers on time, with the result that they had to be sold at a loss. Kierzkowski testified that he personally interviewed and assigned Aiello to help him eliminate the backlog of unused books. He claimed that even after the backlog had been eliminated, Lewis again failed to complete returns properly, and Aiello was assigned to do the work for a second time.

Kierzkowski also stated that Lewis had not adequately kept stock control cards in her files, and had not conducted regular inventory checks to see which books should be reordered. Mr. Fong testified that, at approximately the same time, he discovered that the paperback technical books had also not been returned or reordered, and that much of the inventory was discolored, worn, and dusty. The district court judge's findings with respect to some of these matters are set forth in the margin.[2]

---

1. Lewis was offered the position of Buyer in the Text Book Department which she rejected because of her desire to remain in the Trade Book Department.

2. The district court found that:

   During the time Ms. Lewis was attaining degrees she held several jobs in the field of books. She worked as a typist in a library, an assistant librarian, a librarian and a salesperson in several bookstores. She spent four years in New York City working in two libraries, two bookstores and the French Embassy during that period. No explanation was offered by Ms. Lewis as to why she

The basic question which was presented at trial, therefore, was whether, despite Lewis' superior paper credentials, she was denied promotion because of her alleged lapses as described by Messrs. Fong and Kierzkowski, or whether the decision was based on race.

The jury's verdict on the section 1981 and section 1983 claims was in the form of special interrogatories:

1. Was plaintiff, Ida Mary Lewis, qualified in October, 1976, for the position of Assistant Buyer in the Trade Book Department?

ANSWER: YES.

2. Was plaintiff, Ida Mary Lewis, more qualified in October, 1976, for the position of Assistant Buyer in the Trade Book Department than Jean Aiello?

ANSWER: YES.

3. Would plaintiff, Ida Mary Lewis, have been promoted to the position of Assistant Buyer but for the fact that she is black?

changed jobs so much and so often. In December, 1965, Ms. Lewis was hired by the University of Pittsburgh to work as a salesclerk in the Pitt Book Center.

From December, 1965, until July, 1966, Ms. Lewis worked as a clerk in the Text Book Department of the Book Center. In July, 1966, she moved to the General Trade Book Department, working as a clerk until July, 1967, when she was promoted to the position of buyer of technical books. [*footnote:* Technical books are books dealing with very specialized, narrow scientific or technical subjects such as physics, economics and engineering. Trade books are popular books and include fiction as well as non-fiction.] Ms. Lewis was the technical book buyer until February, 1975, at which time the technical book department was merged into the trade section causing her job to be phased out. After her position was eliminated, Ms. Lewis was offered a buyer's position in the text book department, which she refused, stating that her interests and skills were in the technical book area. She then became a sales clerk in the trade department, the position she currently holds.

The incident which precipitated this lawsuit occurred in October, 1976. An assistant buyer's position in the Trade Book Department became available. A notice of this opening was posted in the Book Center and five women applied, including Ms. Lewis. The selection committee consisted of Mr. Dwight Fong and Mr. Russell Kierzkowski, the two trade book department buyers. Mr. Fong is a Chinese-American. Mr. Kierzkowski is of Polish origin and married to a Mexican national. All five job applicants were employees of the Center.

The selection process was simple since Messrs. Fong and Kierzkowski knew all the applicants. Each applicant was interviewed for five to ten minutes by the two men. They simply informed the prospective applicant of the duties and responsibilities which went with the job. Mr. Fong testified that he also had checked the job applications submitted by each applicant when she originally sought a job at the Book Center. Mr. Kierzkowski, however, did not read those applications. Both men believed that they did not need to spend time reviewing the personnel files of each applicant since the applicants already worked at the book center and the men had personal knowledge of the work history and the work habits of each. Within one week after posting the notice of vacancy, Mr. Fong and Mr. Kierzkowski chose Jean Aiello.

\*   \*   \*   \*   \*   \*

While still a student at Pitt, Ms. Aiello had worked part time at the Book Center as a sales clerk. She became a fulltime clerk in the Trade Book Department in 1972 after she withdrew from school. She worked as a salesclerk in the Trade Book Department under the supervision of Mr. Fong and Mr. Kierzkowski from 1972 until October, 1976, when she was chosen for the assistant buyer's position. Ms. Aiello is still the assistant buyer in the Trade Book Department.

Ms. Lewis contends that she was more qualified for the position of assistant buyer than Ms. Aiello by virtue or her educational background and previous experience as a buyer; she asserts that she was denied the promotion because of her race. Mr. Fong and Mr. Kierzkowski testified that the reason she was not promoted was her poor and inefficient work habits. They stated that while she was a buyer of technical books, she had a history of not following store procedure properly, i.e. she did not do her book returns and stock checks, and they gave many examples of these deficiencies. Ms. Aiello, on the other hand, had learned and followed store procedures very well, and, according to Messrs. Fong and Kierzkowski, did what she was told to do efficiently, requiring only minimal supervision. We find that Ms. Lewis did have a poor work record, as a buyer from 1967 until 1975, and due to that poor record, was denied the promotion. There is absolutely no direct or circumstantial evidence that she was denied the promotion due to her race.

App. at 42–45.

ANSWER: NO.

Thus, the jury, while finding Lewis to have qualifications superior to those of Aiello, nonetheless found that Lewis was not denied promotion because of her race.

As required by the statute, the district court judge entered separate findings of fact on the Title VII claim.[3] He concluded that:

> [Lewis] failed to prove by a preponderance of the evidence that the reasons for the denial of the promotion as articulated by Messrs. Fong and Kierzkowski were a mere "cover up" or pretext for a racially discriminatory intent. Ms. Lewis would have been denied the promotion even if she were not black. Her poor work history, *not* her race, was the cause or motivating factor of the denial.

App. at 47 (emphasis in original). He therefore granted judgment to defendants on the Title VII claim and entered judgment for defendants on Lewis' 1981 and 1983 claims based upon the jury's response to Interrogatory No. 3.

## II.

■ Lewis has raised a number of issues on this appeal. After carefully examining the record and her contentions, we conclude that the district court did not err in entering judgment for the defendants on all claims. One issue, however, requires discussion. Lewis charges that the trial judge was incorrect in instructing the jury as to the level of causation required for her to succeed on her claims. We are satisfied, as was the district court, that Title VII and sections 1981 and 1983 all require a showing of "but for" causation in an employment discrimination suit.

### A.

■ To establish employment discrimination, it must be shown that the employer bore a racially discriminatory animus against the employee, and that this animus manifested itself in some challenged action, whether it be dismissal, failure to promote, or failure to hire. *See, e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 334–35, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977) ("ultimate factual issues are ... simply whether there was a pattern or practice of ... disparate treatment and, if so, whether the differences were racially premised"); *General Electric Co. v. Gilbert,* 429 U.S. 125, 137 n. 14, 97 S.Ct. 401, 409 n. 14, 50 L.Ed.2d 343 (1976) (Plaintiffs "who seek to establish discrimination have the traditional civil litigation burden of establishing that the acts they complain of constituted discrimination in violation of Title VII"); *Massarsky v. General Motors Corp.,* 706 F.2d 111, 117 (3d Cir.1983) ("plaintiff alleging disparate treatment ... bears the ultimate burden of persuading [the trier of fact] that his treatment was caused by purposeful or intentional discrimination").

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court announced the manner in which discrimination must be established: (1) the employee must show a prima facie case of discrimination,[4] (2) once a prima facie case has been shown, the burden shifts to employer to articulate some non-discriminatory reason for the challenged action, (3) if such a facially legitimate reason is proffered, the employee must then bear the burden of demonstrating that the reason given by his employer is in fact merely a pretext, i.e. a fiction which obscures the reality of racial discrimination.

■ It is important to recognize that *McDonnell Douglas* does not in any way relieve the employee of his basic burden of

---

3. *See supra* note 2.

4. A prima facie case may be shown in a variety of ways, and no one set of criteria is applicable in all situations. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. The *McDonnell Douglas* Court described one method which is often useful: (1) plaintiff must belong to a racial minority; (2) he applied and was qualified for a job for which the employer was seeking applications; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applications from persons of the complainant's qualifications. *Id.* at 802, 93 S.Ct. at 1824.

proof. As the Court explained in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.... The *McDonnell Douglas* division of intermediary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. At each stage in the procedure, the issues are winnowed and narrowed, and the factual inquiry proceeds to a new level of specificity. *Id.* at 255, 101 S.Ct. at 1094. When the litigation reaches the third and last stage, the plaintiff's burden in showing that the proffered justification is merely a pretext "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256, 101 S.Ct. at 1095.

It is in this third step of the *McDonnell Douglas* analysis that the issue of causation is most directly posed. The Supreme Court took great pains to emphasize in *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) that nothing has altered the plaintiff's burden in showing that intentional "but for" discrimination exists. In focusing on "but for" causation, the Supreme Court stated that:

> The use of the term "pretext" in this context does not mean, of course, that the Title VII plaintiff must show that he would have in any event been rejected or discharged solely on the basis of his race, without regard to the alleged deficiencies [in work-related performance]; ... *no more need be shown than that race was a "but for" cause.*

5. While the cases cited above do not mention actions brought under § 1981 and § 1983, such claims require the same elements of proof as a Title VII action. *Gray v. Board of Higher Education,* 692 F.2d 901, 905 (2d Cir.1982); *Setser v. Novack Investment Co.,* 657 F.2d 962, 967 & n. 5 (8th Cir.1981); *Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir.1980);

*Id.* at 282 n. 10, 96 S.Ct. at 2579 n. 10 (emphasis added).

We find no indication in any decisions of the Supreme Court, or of any other court, that signals any deviation from the use of the "but for" test of causation.[5] *Accord, Mack v. Cape Elizabeth School Board,* 553 F.2d 720 (1st Cir.1977); *see League of United Latin American Citizens (LULAC) v. City of Salinas Fire Department,* 654 F.2d 557 (9th Cir.1981). The effort by the dissent to suggest a test other than the Supreme Court's "but for" test is not persuasive. *See* Dissenting Opinion, Typescript at 5–6. Judge Adams, writing in dissent, cites to *United States v. Hayes International Corp,* 6 FEP Cases (BNA) 1328 (N.D.Ala.1973), *aff'd without opinion,* 507 F.2d 1279 (5th Cir.1975), in support of his argument. However, that case was decided and affirmed prior to the Supreme Court's pronouncement in 1976 of the "but for" test found in *Santa Fe.* Moreover, in operation, the *Hayes* "any part" standard, although not artfully articulated, can be explained as part of the "but for" analysis. Judge Adams' dissent also cites to Brodin, *The Standard of Causation in Mixed-Motive Title VII Actions: A Social Policy Perspective,* 82 Colum.L.Rev. 292 (1982). The Brodin article, however, concludes with a test for causation no different than the Supreme Court's test, and the test that we adopt here, since Brodin would require that the employee show that the "same decision" would not have been reached absent racial animus.

### B.

Lewis argues that she need only show that race was a "substantial" or "motivating" factor leading to the defendants' decision not to promote her to assistant buyer.[6] In support for this proposition,

*Patterson v. American Tobacco Co.,* 535 F.2d 257, 270 (4th Cir.1976); *see also New York Transit Authority v. Beazer,* 440 U.S. 568, 583–84 n. 24, 99 S.Ct. 1355, 1364–65 n. 24, 59 L.Ed.2d 587 (1979) ("§ 1981 provides no greater substantive protection than Title VII).

6. The parties' requests for jury charges, which were to have been filed on December 10, 1982,

Lewis cites, inter alia, *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (alleging abridgement of first amendment rights by government employer).

In *Mt. Healthy,* however, Justice Rehnquist specifically *rejected* the proposition that, under § 1983, it was enough to show that protected constitutional activity was a "substantial factor" leading to the challenged action. *Id.* at 285, 97 S.Ct. at 575. *Mt. Healthy* merely found that, after an initial showing that protected activity was a "substantial" or "motivating factor," the burden shifted to defendants to show that the same action would have occurred even in the absence of such activity. *Id.* at 287, 97 S.Ct. at 576. It therefore did not deviate from the requirement of "but for" causation; rather, its only effect was to allocate and specify burdens of proof. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Court stated that "[p]roof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such a proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n. 21, 97 S.Ct. at 566 n. 21.

Lewis also calls to our attention *Whiting v. Jackson State University,* 616 F.2d 116 (5th Cir.1980), and *Niederhuber v. Camden County Vocational & Technical School District Board of Education,* 495 F.Supp. 273 (D.N.J.1980), *aff'd* 671 F.2d 496 (3d Cir. 1981), as support for the test which she argues should be employed. *Niederhuber's* analysis does not differ from *Mt. Healthy's,* on which it relies. *Whiting,* which referred to *Arlington Heights* but not to *Mt. Healthy,* noted that in proving pretext un-

der the third part of the *McDonnell Douglas* analysis, "Title VII is not violated simply because an impermissible factor plays *some* part in the employer's decision. The forbidden taint need not be the sole basis for the action to warrant relief, but it must be a *significant* factor." *Id.* at 121 (emphasis in original). Lewis contends that this language adopts a test which is less stringent than the traditional "but for" requirement.

We do not read *Whiting* as departing from the "but for" causation requirement. By definition, a "significant" factor is one which makes a difference in the result. Conversely, if an action would have been taken regardless of race, any discriminatory factor could hardly be called "significant." We can discern little difference in the result between a "significant factor" test and the "but for" test. Indeed, as the term "significant factor" is employed in *Whiting,* we would deem it to be the functional equivalent of the "but for" test which the Supreme Court has preferred. For ourselves, we too prefer the Supreme Court's concept of "but for," as we regard it as the more analytically measurable, and a concept which can be employed more easily by a jury. At any rate, nothing in *Whiting* supports Lewis' argument that race as "a substantial" or "a motivating factor" has supplanted "but for" causation as the test by which her claims must be measured.

### III.

With *Santa Fe Trail* and our understanding of Lewis' argument as a background, we turn to a consideration of the instructions given to the jury in Lewis' case. Lewis, in an in chambers colloquy,[7] argued that "the standard is that the consideration of race must only be a significant or a contributing . . . or a substantial reason." App. at 453. The district court judge in his causation charge, however, instructed

---

are for some reason not contained in the record before us and no notation of their filing is disclosed on the district court docket sheet. Thus, we do not have Lewis' actual proposed charge and we have been obliged to construct

Lewis' argument from the in chambers colloquy in which the parties and the court engaged on December 15, 1982.

7. *See supra* note 6.

the jury in terms of "but for" causation, i.e. "... but for the fact that Miss Lewis is black, would she have been promoted." App. at 531–32; *see also* App. at 522–23, 527–28. In so instructing the jury, the district court judge also referred to race in terms of "the determinative factor." Lewis has seized upon that expression as vitiating the court's entire charge, and complains that the charge which should have been given would have required Lewis to prove that race was only a "substantial" or "motivating" factor. App't Br. at 20.

Had the district court judge charged the jury that race must be "the determinative factor" without more, Lewis' position might have been more substantial than we find it to be.[8] In this case, however, the district court did charge much more. On at least three occasions, the judge stated and restated the basic "but for" test mandated by the Supreme Court.

The basic instruction on causation was as follows:

The defendants intended to or purposefully discriminated against plaintiff only if her race was the determinative factor in their failure to promote the plaintiff. *This means that the defendants refused to promote the plaintiff because she was black, and that but for the fact that she was black, the plaintiff would have been promoted.*

If the defendants failed to promote the plaintiff for any other reason than her race, then you cannot find that the defendants intentionally and purposefully discriminated against the defendant [sic] because of her race.

The consideration of race need not be the sole basis for the decision not to award the position to plaintiff, but it must be the determinative factor in the decision. If you find that Defendants did not intentionally and purposefully discriminate against the plaintiff because of her race, by failing to promote her, then you must find for the defendant.

App. at 522–23 (emphasis added).

Later, the judge added:

In summary, you must find for the plaintiff if you find that the plaintiff has proved by a preponderance of the evidence that, one, she was better qualified for the position of assistant buyer in the trade book department than Miss Aiello, and, two, that the determinative factor of the defendant's decision to deny Miss Lewis the promotion was her race. In other words, *but for the fact that Miss Lewis is black, she would have gotten the promotion. . . .*

App. at 527–28.

The district court judge stressed the point one last time near the end of his instructions:

Remember, ladies and gentlemen, what a polestar is. A polestar is a conspicuous star like the North Star. The basic question that you must answer in this case is, *but for the fact that Miss Lewis is black, would she have been promoted.* All the

---

**8.** There may be several determinative factors which lead to any given decision, all of which can be "but for" causes of the challenged action. The ultimate "but for" test, however, subsumes within its determination all such factors. See *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st Cir.1979); *Laugesen v. Anaconda Co.,* 510 F.2d 307 (6th Cir.1975); *Bentley v. Stromberg-Carlson Corp.,* 638 F.2d 9 (2d Cir.1981); discussed in text *infra.*

In an analogous situation, Judge Aldisert, writing for the Court in *Smithers v. Bailar,* 629 F.2d 892 (3d Cir.1980), dealt with a similar argument in the context of an age discrimination challenge. Judge Aldisert addressed himself to the relevant language as follows:

Appellant contends that the court erred in burdening the plaintiff with proving that age

was "*the* determinative factor" instead of "a determinative factor" in the selection of Barry. This argument has a superficial appeal because obviously the plaintiff need only prove that age was somehow determinative of the Board's decision. Perhaps the formulation by the district court would have been more clear if it had used the indefinite rather than the definite article. This difference should not be overemphasized, however, because important statements may easily and critically be altered simply by removing them from context. Recognizing this possibility of distortion in jury instructions, an appellate court reviews the charge as a whole, preserving context.

*Id.* at 896 (emphasis in original).

rest of the case revolves around that polestar.

App. at 531–32.

Thus, the district court emphasized and reemphasized the requirement that, whatever else the jury found, it had to decide whether Lewis would have been promoted "but for" the fact that she was black. The charge, therefore, although using the term "the determinative factor," did not rely on either "the determinative factor" or "a determinative factor" as the dispositive inquiry, for either is subsumed within the question posed by Interrogatory No. 3: "Would plaintiff, Ida Mary Lewis, have been promoted to the position of Assistant Buyer but for the fact that she is black?" Nor, understandably, was the jury required to make such a determination, for as the charge reveals, it was the "but for" test of causation which the district court judge commanded the jury to employ.

Every mention of the term "the determinative factor" in the judge's charge was accompanied by, and concluded with, a meticulous description of the "but for" test. Not only did the district court judge properly instruct the jury as to the "but for" test required by the Supreme Court during the liability aspect of his charge, but he also returned to the "but for" feature of his instructions after he had concluded charging on damages. It was at the end of his charge on damages that he repeated once again that the polestar and the basic question to be answered is "but for the fact that Miss Lewis is black, would she have been promoted. All the rest of the case revolves around that polestar." Indeed, the crucial causation interrogatory was framed in those terms.

■ Whether or not the district court judge used the term "the determinative factor," therefore, is not so important as how he explained that term. It is of course the substance of the instruction rather than the form which determines its correctness. In an analogous context, the First Circuit in *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st

Cir.1979) (suit under Age Discrimination in Employment Act), approved use of "the determining factor" in a district court's charge. It did so by recognizing that "the determining factor" was to be combined with the "but for" test as the correct measure of causation. The court stated:

> [T]he court should [instruct] the jury that for plaintiff to prevail he had to prove by a preponderance of the evidence that his age was the "determining factor" in his discharge *in the sense that "but for" his employer's motive to discriminate against him . . . he would not have been discharged.*

*Id.* at 1019 (emphasis added). *See Laugesen v. Anaconda Co.,* 510 F.2d 307, 317 (6th Cir.1975) (discriminatory factor must have "made a difference in determining whether [employee] was to be retained or discharged"). In *Bentley v. Stromberg-Carlson Corp.,* 638 F.2d 9 (2nd Cir.1981), the court stated that:

> Although we . . . saw no significant difference between the *Laugesen* formulation [discrimination must "make a difference" in the decision] and the "determining factor" charge enunciated in *Loeb v. Textron, Inc.* . . . we did not mean to suggest approval of an instruction that stated only that the jury must find age to be a "determining" factor without clarifying that term. Instead . . . a plaintiff must prove that age was a "determining factor in his discharge in the sense that 'but for' his employer's motive to discriminate against him because of his age, he would not have been discharged."

*Id.* at 11–12 (quoting *Loeb,* 600 F.2d at 1019).

■ Here, the district court not once— but at least three times—explained and clarified the "but for" test and its use of "the determinative factor." By doing so, the district court correctly and clearly conformed to the requirements and clarifications specified by *Santa Fe, Loeb,* and *Bentley.*[9]

**9.** Judge Adams' dissent, in discussing "the determinative factor" and his "illustration" (*see*

Dissenting Opinion, at 922) mischaracterizes our discussion which took pains to point

■ Moreover, it is well established that in framing jury instructions, particularly where no specific requests are of record, the district court has wide latitude. *E.g. United States v. Quick,* 128 F.2d 832 (3d Cir. 1942); *see also United States v. Logan,* 717 F.2d 84 at 93 (3d Cir.1983) (Garth, J., dissenting). He may accept the language submitted by counsel or may substitute his own language in framing instructions, provided always of course that the substance is correct. Here, where the record does not re-

veal plaintiff's actual requested charge (*see supra* note 6) and where the plaintiff's requested charge must be gleaned from an equivocal colloquy with the court, it nevertheless is apparent that the district court judge did not err in explaining and charging the correct test to be employed by the jury.

We have also examined Lewis' other arguments made on appeal and find them without merit.[10]

---

out that, when adequate "but for" instructions are given, reference to "*the* determinative factor" may not necessarily constitute error. That discussion follows *Smithers v. Bailar,* 629 F.2d 892 (3d Cir.1980); *see supra* note 8. Thus, Judge Adams' illustration would lead to the opposite conclusion than that which he proposes, i.e. if a black, unsuccessful plaintiff-employee could show that, *but for* his race, he would have been promoted or hired or not discharged, such a plaintiff would prevail, and he would do so whether the subsidiary instructions spoke of race as *a* determinative factor or as *the* determinative factor.

10. The dissenting opinion would find error in the district court's refusal to permit the introduction of evidence which would tend to show that nepotism entered into the decision to promote Aiello instead of Lewis. (Aiello was apparently the niece of Mary Bonasso, the operations manager of the Bookstore). We cannot find, however, that the district court abused its discretion in excluding this evidence. As the district court noted, whether or not nepotism entered into the decision to promote was not relevant to a finding of *racial* discrimination. Indeed, a showing that any other factor other than race was a determinative factor in the decision would actually buttress the University's defense.

The dissenting opinion would also remand this case for a new trial, due to what it perceives to be a defective charge to the jury by the district court regarding inferential or circumstantial proof of intent to discriminate. We note at the outset, as the dissenting opinion itself conceded, that Lewis never requested a special charge on inferential proof of intent, nor did she object to the instructions in this regard. Normally, this would foreclose our review of any alleged insufficiency in the jury instructions. Fed.R.Civ.P. 51. We also note that Lewis never raised this issue on appeal. Although the dissenting opinion argues strenuously that the absence of a special instruction constitutes plain error, we cannot agree that it is required that we raise this issue sua sponte.

Moreover, we believe that the charge actually given adequately addresses Judge Adams' concerns. We find nothing to indicate that the

district court ever prevented Lewis from presenting proofs which might discredit the University's articulated reason for not promoting her. We have no quarrel with the contention that proof of intent can be shown by either direct or indirect proof. The trial judge, however, gave explicit instructions in this regard, when he charged:

Now, there are, generally speaking, two types of evidence from which the jury may properly find the truth as to the facts of this case. Once is direct evidence, such as the testimony of any eyewitness. And both attorneys have told you, and I am inclined to agree with them, that there has been little or no direct evidence in this case with respect to the ultimate question involved here.

The other type of evidence is indirect or circumstantial evidence pointing to the existence or nonexistence of certain facts....

As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that the jury find the facts in accordance with the preponderance of all the evidence in the case, both direct and indirect.

App. at 515–16. Later, the district court returned to this theme:

Now, intent ordinarily may not be proved directly because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer a person's intent from surrounding circumstances. You may consider any statement made or act done or omitted by any party whose intent is in issue, and all other facts and circumstances which indicate his or her state of mind.

You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts done knowingly or knowingly omitted, but it is for you to determine what facts have been established by the evidence.

App. at 523–24.

The dissent would apparently require that a new element be added to the *McDonnell Douglas/Burdine* instructions which would restate the instructions already given in a more emphatic manner. We find no support for the creation of such a requirement, nor has it ever

## IV.

Our review of the district court's charge reveals that the district court properly instructed the jury in terms of the Supreme Court's "but for" test. Thus, it was not error for the district court to decline to charge the plaintiff's requested test of "substantial" or "motivating" factor. Nor did the district court err in the use of the term "determinative factor" in its clarification of the "but for" test. For these reasons, the judgments of the district court dated December 10, 1982 (pertaining to the sections 1981 and 1983 (jury) claims) and January 1, 1983 (pertaining to Lewis' Title VII claim) will be affirmed.

ADAMS, Circuit Judge, dissenting.

This appeal starkly demonstrates the need to reaffirm the fundamental policy behind statutory protections against employment discrimination.

In the case before us, the trial court misconceived the substantive rights protected by the antidiscrimination statutes, as well as the evidentiary burden—both intermediate and ultimate—allocated to a plaintiff by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Thus while I agree with the majority that all three statutory claims in this proceeding are governed by the same legal standards, and while I also agree that Ida Mary Lewis had the ultimate burden under all three claims of proving that she was denied a promotion because of her race, I cannot join the majority's conclusion that the district court charged the jury with, and itself applied, the proper legal standard by which to determine whether race was the grounds for the University's decision not to promote Ms. Lewis. Nor do I agree with the exclusion of testimony regarding possible nepotism in the promotion decision. Accordingly, I respectfully dissent.

## I.

Racial discrimination in employment is a serious societal ill for which Congress has prescribed strong statutory remedies:

What is required by Congress [in Title VII] is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

*Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The Supreme Court has further noted that

[t]he language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens.

*McDonnell Douglas, supra,* 411 U.S. at 800, 93 S.Ct. at 1823 (1973).

Title VII case law may be divided into two discrete types of claims: 1) those challenging practices that have a disparate impact upon members of a protected class; and 2) those challenging the disparate treatment of individual members of a protected class with regard to hiring, pay, promotions, and the like. In addressing the second type of claim, which is represented by the case at bar, this Court has declared that

[a] plaintiff alleging disparate treatment ... bears the ultimate burden of persuading the jury that his treatment was "caused by purposeful or intentional discrimination."

*Massarsky v. General Motors Corp.,* 706 F.2d 111, 117 (3d Cir.1983), *cert. den.,* —— U.S. ——, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983), quoting *Smithers v. Bailar,* 629 F.2d 892, 898 (3d Cir.1980).

Employment discrimination claims brought under 42 U.S.C. § 1981 are governed by the same standards as actions brought pursuant to the disparate treatment strand of Title VII. *Wilson v. Legal Assistance of North Dakota,* 669 F.2d 562,

been recommended in any handbook or treatise. *See* Devitt & Blackmar, *Federal Jury Practice and Instructions* § 92.25 (Supp.1982)

(proposing model instructions, but in ADEA context, citing in "Notes," *Burdine* and *McDonnell Douglas* as authority).

563–64 (8th Cir.1982); *Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir.1980); *Johnson v. Alexander,* 572 F.2d 1219, 1223 (8th Cir.1978), *cert. denied,* 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978); *Patterson v. American Tobacco Comp.,* 535 F.2d 257, 270 (4th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); *Waters v. Wisconsin Steel Works,* 502 F.2d 1309, 1316 (7th Cir. 1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). These same criteria apply to claims brought under 42 U.S.C. § 1983 when the § 1983 action provides a parallel remedy for the transgression of rights conferred by Title VII.[1] *Whiting, supra* at 121; *Carrion v. Yeshiva University,* 535 F.2d 722, 729 (2d Cir.1976).

## II.

Considerable confusion surrounds the proper formulation of the ultimate issue in a disparate treatment employment discrimination claim. Although I believe the principal error committed at trial in this case was the preclusion of inferential proof, I also cannot join the majority in holding that the burden upon Ms. Lewis was to show that race was "the but for" reason for the University's failure to promote her.

The majority relies heavily upon *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), for the proposition that the Supreme Court has clearly articulated a restrictive "but for" standard. It is noteworthy that the majority points only to one footnote in *Santa Fe Trail* for this proposition. *Id.* at 282 n. 10, 96 S.Ct. at 2579 n. 10. The sparse documentation is reflective of the fact that the Supreme Court has yet to address the degree of causation a plaintiff must establish to prevail on a Title VII disparate treatment claim. Indeed, the cited footnote states only that "no more need be shown than that race was a 'but for' cause." *Id.* The "no more need be shown" phrase indicates that a showing of but for causation would be *sufficient;* it does not signify that such a showing is *necessary* to prevail.[2] Moreover, the footnote uses the article "a" rather than "the" to describe how determinative a discriminatory factor must be to satisfy the requirements of "but for."

The majority cites only two cases to support its interpretation of the *Santa Fe Trail* footnote. *LULAC v. City of Salinas,* 654 F.2d 557 (9th Cir.1981); *Mack v. Cape Elizabeth School Bd.,* 553 F.2d 720 (1st Cir. 1977). While the First Circuit, without substantive discussion or any analysis, does require that the discriminatory reasons be shown to be determinative, the Ninth Circuit does not support the majority's position. Rather, *LULAC* concerns a defendant's claim that the district court failed to require a showing that the discriminatory acts alleged "actually caused ... [the] failure to be promoted." 654 F.2d at 558. Significantly, the Ninth Circuit expressly refused to require such a showing.

Apart from *LULAC* and *Mack,* the case law is split between courts holding that "[i]f *any element* of racial discrimination or retaliation or reprisal *played any part* in a challenged action, no matter how remote or slight or tangential, the Court would hold that the challenged action was in violation of ... the law ...," *United States v. Hayes Int'l Corp.,* 6 FEP Cases (BNA) 1328, 1330 (N.D.Ala.1973) (emphasis added), *aff'd* 507 F.2d 1279 (5th Cir.1975), *see also* Brodin, *The Standard of Causation in the Mixed-Motive Title VII Action: A Social*

1. The question whether state action was present here for purposes of § 1983 was not raised in the pleadings, at trial, or in the briefs.

2. In the context of an Age Discrimination in Employment Act case, this Court has expressed a strong preference for an "a determinative factor" rather than "the determinative factor" analysis. *Smithers, supra,* 629 F.2d at 896–97. Although the Court in *Smithers* did not reverse the trial court for its inadvertent use of "the," it clearly implied that absent the curative use of "a determinative factor" as the ultimate legal standard for weighing the employment discrimination claim, the verdict for the defendant could not have withstood scrutiny. We further note that *Smithers* involved a bench trial where the effects of an incorrect formulation of the ultimate issue are more easily circumscribed and evaluated than in a jury trial.

*Policy Perspective*, 82 *Col.L.Rev.* 292, 308 n. 75 (citing cases for same proposition), and those cases that hold that the prohibited discrimination must be *a significant factor*. *See Whiting, supra; see also* Brodin, *supra*, at 309 n. 78 (citing cases following the *Whiting* analysis).[3]

To require an alleged victim of discrimination to prove that race was "the determinative factor" in the employer's decision not to hire or promote would severely hamper the ability of victims of discriminatory treatment to vindicate their statutory rights. At bottom, this standard amounts to a "sole basis" test which finds little or no support in the case law or in the legislative history of Title VII. In fact, during the legislative debates on Title VII, Senator McClellan proposed an amendment which would have established the "sole basis" test. In reply, Senator Case argued:

> The Senator from Arkansas, as always, seeks to provide the benefit of great clarity and simplicity in his objectives and methods. The difficulty with this amendment is that it would render title VII totally nugatory. If anyone ever had an action that was motivated by a single cause, he is a different kind of animal from any I know of. But beyond that difficulty, this amendment would place upon persons attempting to prove a violation of this section, no matter how clear the violation was, an obstacle so great as to make the title completely worthless. I therefore regret that we are obliged to oppose the amendment, and also to recommend that it be rejected.

110 Cong.Rec. 13,837–38 (1964). Both the proposed McClellan amendment and a similar proposal in the House were defeated prior to ratification of the Civil Rights Act of 1964. To permit by judicial fiat what Congress specifically rejected raises a serious separation of powers question.

An illustration may shed additional light on my concern: two similarly qualified applicants apply for a job; one is white, the other black. After the white applicant is selected, the black applicant sues. The employer testifies that while race was of course a factor, it was not "the" reason for the hiring decision. He goes on to explain that race was one factor leading to the hiring of the white applicant, but not the major one. Under the majority's analysis the black plaintiff would not prevail. I do not believe that the legislative intent undergirding Title VII and the other anti-discrimination statutes may be reconciled with such a result. If these statutes are to have the effect sought by Congress, namely ridding society of discrimination in employment, the introduction of race as any consideration in hiring must not be allowed to withstand judicial scrutiny. It bears emphasis that the leading Supreme Court decision in this area, *McDonnell Douglas*, requires only that a plaintiff "persuad[e] the court that *a* discriminatory reason more likely motivated the employer." 450 U.S. at 256, 101 S.Ct. at 1095 (emphasis added).

Thus I must respectfully dissent from the majority's unduly restrictive reading of the "but for" factor.

### III.

Equally important to the present case are the trial errors not addressed by the majority. In this type of disparate treatment claim, I believe that a "critical issue . . . concerns the order and allocation of proof in a private, non-class action challenging racial discrimination." *McDonnell Douglas, supra*, 411 U.S. at 800, 93 S.Ct. at 1823. Even if the district court had properly posed the question whether race was a significant factor in the hiring decision or, alternatively, whether race was a "but for" cause of the denial of the promotion to Ms. Lewis, this would not have terminated the

---

**3.** The majority's reading of *Whiting* is unpersuasive. Acknowledging that the Fifth Circuit supports "a significant factor" test, the majority nevertheless reads this to be equivalent to a but-for test which, in turn, is equivalent to a determinative factor test. I cannot discern how a test premised on the difficulty of identifying the ultimate operative motivation in what is often a complex and involved decision can be reduced to a test requiring a plaintiff to prove that one identifiable factor was determinative.

judicial inquiry. Of further consequence is the manner in which a plaintiff establishes that race was a significant factor in a refusal to hire or promote.

This Court has taken notice of the fact that "because it often will be difficult for the plaintiff to obtain direct evidence of the employer's motive, the Supreme Court in *McDonnell Douglas* ... articulated a set of rules of proof that give the plaintiff the benefit of a presumption operating in his [or her] favor." *Massarsky, supra,* 706 F.2d at 117–18. This "benefit" to the plaintiff is created by an evidentiary shifting of the burden of production to allow a legally cognizable inference of discrimination to be created:

> The *McDonnell Douglas* case involved an individual complainant seeking to prove one instance of unlawful discrimination. An employer's isolated decision to reject an applicant who belongs to a racial minority does not show that the rejection was racially based. Although the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one.

*Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977).

In *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), Justice Rehnquist summarized the case law providing for inferential proof of discriminatory intent:

> The method suggested in *McDonnell Douglas* ... is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A pri-

ma facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.... And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race.

An examination of the mechanics of the *McDonnell Douglas* standard demonstrates how the use of presumptions is employed to arrive at the ultimate issue in an employment discrimination claim. To create a prima facie case, the plaintiff must establish:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. Such a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. "If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

Upon the establishment of a prima facie case, the burden of production then shifts to the defendant to rebut the presumption of discriminatory intent by producing evidence that the employee was rejected or someone

else advanced for legitimate, nondiscriminatory reasons. *Id.* This is accomplished by introducing evidence setting forth the reasons for the plaintiff's rejection.

The Supreme Court has carefully detailed the purpose of the second step of *McDonnell Douglas:*

> Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Burdine, supra,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95. The plaintiff now has the full burden of establishing that race was a significant factor in the failure to promote. This, however, can be accomplished *either inferentially or directly:*

> [The plaintiff] must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this *either directly* by persuading the court that *a* discriminatory reason more likely motivated the employer *or indirectly* by showing that the employer's proffered explanation is unworthy of credence.

*Id.* at 256, 101 S.Ct. at 1095 (emphasis added).

At the third step, the immediate burden, that of production or going forward with the evidence, comes together with the ultimate burden of this or any case, that of persuasion or proof. The use of these various terms should not obscure the importance of the *McDonnell Douglas* test. In order to arrive at the plaintiff's ultimate burden in employment discrimination claims, the intermediate shifting of subordinate burdens allows for inferential conclusions. Thus, while I do not take issue with the majority's assertion that the burden of proof rested with the plaintiff, I believe that the district court's treatment of the intermediate burdens was flawed.

IV.

By requiring the jury to find direct proof of the ultimate issue in Ms. Lewis' claim, the district court in effect foreclosed the indirect method of proof sanctioned by the *McDonnell Douglas* test. In particular, the district court's instruction prevented Ms. Lewis from prevailing by demonstrating that the non-discriminatory reasons proffered by the University were unworthy of belief. Such indirect proof was especially critical to Ms. Lewis's case since she had succeeded in proving to the jury's satisfaction that she was "more qualified" than the applicant promoted in her stead. Yet, because of the trial court's apparent misunderstanding of *McDonnell Douglas,* the jury was prevented from evaluating the significance of her indirect proof.

Instead of explaining the two types of proof permitted at the third stage of *McDonnell Douglas,* the trial judge instructed the jury only on what it viewed as the ultimate issue in an employment discrimination case—whether race was the "but-for" cause of the challenged decision. As the majority has documented, *see* Maj.Op. at 917–918, the trial judge repeatedly explained the concept of "but-for" causation and emphasized that this "polestar" or basic question was the crucial inquiry in the case. What the judge failed to explain, however, was the fact that the ultimate issue in an employment discrimination claim need not be proven directly, but may also be established inferentially by a showing that the reasons offered by an employer are "unworthy of credence." *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095.

The trial judge's sole discussion of indirect proof in the context of the *McDonnell*

*Douglas* test[4] effectively transformed the evidentiary steps into a requirement of direct proof of the ultimate issue. He said:

> The burden is on the plaintiff to prove by a preponderance of the evidence that the reasons stated by the defendants were just a pretext for a racial [sic] discriminatory reason. If the plaintiff can show the reasons stated by the defendants are a pretext, if she proves they are not the true reasons that the plaintiff was not promoted and that the plaintiff's race was the determinative factor for the denial of the promotion ... then your verdict must be for the plaintiff.

Tr. at 536–37. Subsequently, the court reiterated this explanation:

> In summary, you must find for the plaintiff if you find that the plaintiff has proved by a preponderance of the evidence that, one, she was better qualified for the position of assistant buyer in the trade book department than Miss Aiello, and, two, that the determinative factor of the defendant's decision to deny Miss Lewis the promotion was her race. In other words, but for the fact that Miss Lewis is black, she would have gotten a promotion. And, three, the reasons advanced by the defendant for denying her the promotion are not true, and, four, the defendant's reasons are merely a pretext for racially discriminatory reasons.

Tr. at 536–37. Thus the judge repeatedly linked proof of "pretext" with proof that the actual reasons were "racially discriminatory." In so doing, he mistakenly incorporated a requirement for direct proof into the indirect approach. Ms. Lewis was not permitted to succeed simply by showing that the University's reasons were unworthy of credence. Rather, the instructions of the court required her to show that the reasons were unworthy of belief because the real reasons were discriminatory.

This collapsing of the indirect and direct branches of proof defeats the purpose of the *McDonnell Douglas* test. The test's three-step minuet of shifting burdens of production is, as Justice Rehnquist explained in *Furnco Construction,* an orderly means of evaluating evidence in light of a presumption that "otherwise unexplained" actions disadvantaging minorities are "more likely than not" the product of "an impermissible consideration such as race." 438 U.S. at 577, 98 S.Ct. at 2949. If at the third step of the *McDonnell Douglas* test the plaintiff is required to prove directly that discriminatory reasons motivated the employer, then the plaintiff is denied the all-important *Furnco* presumption of impermissible motive; the *McDonnell Douglas* test is thereby reduced to an empty ritual. There is no reason for the parties to trudge through the three steps of the test if, at the third step, the plaintiff is forced to prove directly the ultimate issue of the case.[5]

4. The trial judge did mention indirect proof at two other points in the instructions. Tr. at 524–25, 532–33. *See* full quotations in Maj.Op. at 919–920 n. 10. But these general explanations of inference are, of course, not directly relevant to the third step of *McDonnell Douglas.*

5. It bears emphasizing that the precision necessary in jury instructions based on *McDonnell Douglas* is by no means a "new element," as the majority has suggested. Maj.Op. at 919–920 n. 10. The majority's reliance on Devitt & Blackmar, *Federal Jury Practice and Instructions* § 92.25 (Supp.1982), is simply misplaced. The cited passage of this handbook refers only to the burden on the defendant to rebut a prima facie case in an Age Discrimination in Employment Act case. This section's treatment of the elements of a bona fide occupational qualification defense does not address the proper instruction to a jury at the third stage of the *McDonnell Douglas* test when a plaintiff seeks to rebut the proffered non-discriminatory reason on the grounds that it is a pretext.

Only last term, the Supreme Court, per Justice Rehnquist, once again affirmed that a plaintiff alleging discriminatory treatment must be allowed to prove discriminatory intent inferentially and that the failure to allow such proof is reversible error. *See U.S. Postal Service Bd. of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983):

> As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence. The trier of fact should consider all the evidence, giving it whatever weight and credence it deserves. Thus, we agree with the Court of Appeals that the District Court should not have required Aikens to submit direct evidence of discriminatory intent. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977)

## V.

While mistaken instructions are ofttimes insignificant and therefore harmless, in the present case it appears very likely that these instructions altered the verdict. In response to special interrogatories, the jury found as follows:

Number one, was the plaintiff, Ida Mary Lewis, qualified in October 1976, for the position of assistant buyer in the trade book department? Answer, yes.

Number two, was the plaintiff, Ida Mary Lewis, more qualified in October 1976, for the position of assistant buyer in the trade book department than Jean Aiello? The answer, yes.

Number three, would the plaintiff Ida Mary Lewis, have been promoted to the position of assistant buyer but for the fact she was black? Answer, no. So say you all.

Tr. 549–50. Despite its finding that Ms. Lewis was "more qualified" than the woman promoted in her place,[6] the jury nonetheless found that race was not the "but for" cause of the University's decision. Given that the University's defense turned on its claim that Ms. Lewis performed her job poorly—that is, that she was less "qualified" than the other applicant—the special verdict lends critical significance to the judge's failure to explain the inferential method of evaluating the evidence. Having found that Ms. Lewis was "more qualified," a properly charged jury might well have inferred under *Furnco* and *Burdine* that Ms. Lewis was a victim of discrimination. But because of the incorrect instructions, Ms. Lewis was denied this opportunity to prevail through the indirect method sanctioned by *McDonnell Douglas.*

The University seeks to avoid the implications of the special verdict by hypothesizing

that the jury believed Ms. Lewis to have superior paper credentials, but inferior job performance. This theory, however, appears to have been foreclosed by the judge's careful instructions explaining the meaning of "qualifications:"

Education, training and experience are factors to be considered in determining the relative qualifications of the plaintiff and Jean Aiello if they are relevant to the person's ability to perform the job. Not all education, training or experience is relevant to the ability to perform every job. However, on-the-job performance is always relevant to a person's ability to perform in a similar or higher job.

Tr. at 534. Thus in answering "yes" to Interrogatory 2, the jury appears to have rejected the legitimate, nondiscriminatory reason advanced by the University. Under these circumstances, the erroneous instruction on inferential proof would normally require the grant of a new trial.

## VI.

Although Ms. Lewis' attorney repeatedly objected to the judge's instruction on causation, he did not request that the judge explain to the jury the inferential method of proof mandated at the third step of *McDonnell Douglas.* Instead, he focused on the instruction that race must be "the" determinative factor, rather than "a" significant factor. Tr. at 456, 459, 460. Thus, in order to review the trial court's explanation of inferential proof—an error independent of the one specifically identified by Ms. Lewis' counsel—an appellate court must determine that the mistaken instructions constituted "plain error." *Smith v. Coy,* 460 F.2d 1226, 1227 (3d Cir.1972).

Our Court, like others, will not find plain error except when the mistake is so funda-

("[T]he *McDonnell Douglas* formula does not require direct proof of discrimination").

**6.** In Special Interrogatory 2, the district court incorrectly charged the jury on the burden of establishing a prima facie case. Ms. Lewis did not have to show that she was "more qualified," but only that she was "as qualified" as the person eventually hired. *See McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at

1824; *see also* Note, Relative Qualification and the Prima Facie Case in Title VII Litigation, 82 Col.L.Rev. 553 (1982) (analyzing case law and policy reasons for requiring plaintiff to show only that he/she was qualified at prima facie stage). Because the jury found Ms. Lewis to be "more qualified," this misstatement constitutes harmless error.

mental and prejudicial that it results in a miscarriage of justice. *Paluch v. Erie Lackawanna RR.,* 387 F.2d 996, 999–1000 (3d Cir.1968); *Ratay v. Lincoln Nat. Life Insur. Co.,* 378 F.2d 209, 212 (3d Cir.1967). *See* 9 Wright & Miller, *Federal Practice and Procedure* § 2558 (1971). We have, however, been willing to review unobjected-to instructions, even in a civil case, if they preclude an accurate understanding of an entire element of a lawsuit. *Choy v. Bouchelle,* 436 F.2d 319, 325 (3d Cir.1970) (plain error found because instructions failed to provide guidelines for applying law to facts); *Ratay, supra,* 378 F.2d at 212 (plain error found because judge incorrectly instructed jury on the burden of proving elements of fraud); *Pritchard v. Liggett & Myers,* 350 F.2d 479, 484–86 (3d Cir.1965) (plain error found because the judge gave incorrect instruction on assumption of risk). In the present case, the judge's instructions negated the "suspicion" that Justice Rehnquist referred to in *Furnco* and the "inference" that Justice Powell referred to in *Burdine,* thereby foreclosing the inferential path to a demonstration of but-for causation. Given that the whole purpose of *McDonnell Douglas* rests on the fundamental importance of inferential proof, and given that such proof was particularly critical to Ms. Lewis' case, I am persuaded that this is one of those unusual situations calling for use of the plain error doctrine in a civil context. On this basis alone, I believe that the plaintiff should be granted a new trial.[7]

### VII.

The trial court committed a third error that was properly objected to and that would independently require a new trial: the exclusion of evidence showing nepotism. Ms. Lewis sought to introduce evidence indicating that nepotism influenced the decision to promote Jean Aiello in her place. In particular, Ms. Lewis asked to introduce testimony that Ms. Aiello was the niece of Mary Bonasso, operations manager of the bookstore and the second-highest ranking member of management. *See* Transcript of In-Chambers Conference (Dec. 13, 1982) at 6. Additionally, Ms. Lewis sought to introduce testimony that the two men who were immediately in charge of the promotion decision knew that their supervisor was Ms. Aiello's aunt.[8] *Id.* Ms. Lewis argued that this evidence would indicate that the decision was improperly motivated. *Id.* at 6–7. Over objection, the judge denied the admission of the evidence, reasoning that the evidence would be "confusing, and I do not think it is relevant to why we are here." *Id.* at 8.

The evidence of nepotism was clearly relevant to the present case for two distinct reasons. First, under *McDonnell Douglas* the burden upon Lewis at the third step was to show that the proffered legitimate, non-discriminatory reasons were not worthy of credence. If Lewis could establish that family relations were the controlling consideration in promotions at the bookstore, the University's defense that the individual chosen for promotion was the most qualified would be undermined. Thus, evidence of nepotism would contribute to the inferential proof of discrimination at the third step of the inquiry. Under Rule 401 of the Federal Rules of Evidence, such evidence was clearly admissible as having a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Second, nepotism is by its nature a nonobjective consideration in hiring or promotional decisions that has the effect of locking in the racial and ethnic status quo. If a workforce is racially segregated and hiring

---

7. Although Ms. Lewis did not focus precisely on inferential proof at the third step of the *McDonnell Douglas* test, in her briefs she made clear her contention that the trial court had erroneously explained the evidentiary burden imposed on a plaintiff in a statutory employment discrimination case. Accordingly, I cannot agree with the majority's suggestion that it is inappropriate to consider this issue on appeal. *See* Maj.Op. at 919–920 n. 10.

8. Ms. Lewis also intended to show that the University of Pittsburgh Staff Handbook prohibits nepotism.

is based on kinship to the workforce in place, the pattern of segregation will not be altered. Thus, in ascertaining whether purportedly legitimate reasons were the actual grounds for the employment decision, evidence that the decision-makers sought to advance "one of their own" bears important inferential weight. The evidence that Lewis sought to introduce was therefore fully relevant to the jury's task of determining under *Furnco* and *Burdine* whether she was a victim of discrimination.

## VIII.

The incorrect formulation of the ultimate burden of proof to be borne by the plaintiff, combined with presence of the plainly erroneous instructions on inferential proof under *McDonnell Douglas* and the exclusion of the nepotism evidence, requires that Ms. Lewis be given a new trial.

Beyond the immediate trial errors, however, this case points to the difficulty of protecting the statutory rights of minorities and women not to be subjected to discrimination in the hiring procedures utilized in our society. Necessarily, choices must be made in allocating a limited number of jobs and promotions. Decision-makers must assess abilities, ambitions, and a number of often indeterminate and non-quantifiable factors. Because in our society employment decisions are generally private, the ability of the courts to review these matters for evidence of discrimination is circumscribed. The time when applicants were turned down directly and openly on the basis of race, sex, national origin, and the like is fortunately drawing to a close. This does not mean, however, that there is no longer any discrimination or that the task of the courts in this regard has been simplified. Today we must address the less easily recognizable forms of discrimination that may be present in closed-door decisions to employ or promote individuals. Without sufficient attention to the need to eliminate considerations of race from any role in the hiring process and without sensitivity to inferential proof of discrimination, we would in effect retard the process of eradicating discriminatory practices and the advances that have been made in this area over the last several decades.

Because I do not believe that the majority opinion is sufficiently attuned to the difficulties of proof in this type of discrimination claim, and because of the errors committed at trial, I must respectfully dissent.

## SUR PETITION FOR REHEARING

Before SEITZ, Chief Judge, ADAMS, GIBBONS, HUNTER, GARTH, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges.

GARTH, Circuit Judge.

The petition for rehearing filed by Appellant Ida Mary Lewis in the above entitled case having been submitted to the judges who participated in the decision of this court, and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

ADAMS, GIBBONS, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges, would grant the petition for rehearing.

**Statement Sur Petition for Rehearing**

ADAMS, Circuit Judge.

Although I do not wish to comment further on the substantive issues in this case, I am constrained to note my uneasiness about a procedural dilemma illustrated by the rejection of Ida Mary Lewis' petition for rehearing in banc. Under the Third Circuit's longstanding practice, a judge who is disqualified in a particular case is in effect counted as a vote against rehearing.[1] Con-

1. The Third Circuit's published rule requires that "rehearing in banc shall be ordered only upon the affirmative votes of a majority of the circuit judges of this court in regular active service." Internal Operating Procedure 9B(4). By well-established custom, our Court has in-

sequently, a panel decision supported by only a small minority of our Court may, because of recusals, be insulated from reconsideration in banc.

Today, as the foregoing order reveals, two of the ten active judges on our Court have recused themselves from voting on Ms. Lewis' petition for rehearing. Thus under Third Circuit custom, her appeal may not be reheard unless six of the eight participating judges—that is, every judge not in the original panel majority—vote to reconsider her case. The vote is only 5–3 in favor of rehearing, and so the petition is denied. To Ms. Lewis, I fear, this result of our Court's in banc voting rule must appear quite unfair.

The main reason for our procedure is that it insures that major developments in the law of the Circuit reflect the participation of all members of the Court. If, for example, five of the ten judges are disqualified from a particular case, our rule absolutely precludes reconsideration of the panel decision. Were the rule otherwise, we could grant a petition for rehearing favored for example by a vote of 3–2. Then the "in banc" panel would consist of only five judges and the settled law of our Circuit could be overturned by as few as three members of the Court. Such a result would be at odds with the goal of intracircuit uniformity underlying Congress' decision to authorize in banc proceedings, *see* H.R.Rep. No. 1246 (to accompany H.R. 3390), 77th

Cong., 1st Sess. (1941); *Hearings on S. 1053 Before a Subcommittee of the Senate Judiciary Committee,* 77th Cong., 1st Sess. 14–16 (1941),[2] a goal clearly embodied throughout our Court's Internal Operating Procedures (I.O.P.'s),[3] and especially emphasized by the Third Circuit's strict rule of *stare decisis* in I.O.P. 8C.[4]

Our approach, however, is by no means required by the wording of the in banc statute, 28 U.S.C. § 46(c) (Supp. V 1981), or by the Supreme Court's interpretation of that statute. Indeed, a straightforward parsing of § 46(c) arguably suggests that disqualified judges should *not* be counted in determining what constitutes a majority vote for rehearing. The in banc statute provides in relevant part:

Cases and controversies shall be heard and determined by a court or division of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit *judges* of the circuit who are *in regular active service.* A court in banc shall consist of all circuit *judges in regular active service.*

28 U.S.C. § 46(c) (Supp. V 1981) (emphasis added). Presumably, the drafters of § 46(c) intended that "judges ... in regular active service" have the same meaning both times it is used. Since a court in banc cannot include recused judges, a consistent interpretation of the phrase "judges ... in

terpreted this rule to mean that participating as well as recused judges be counted in determining the number of judges constituting a majority. *See* Maris, Hearing and Rehearing Cases in Banc, 14 F.R.D. 91, 95 (1953).

2. Congress did not enact the in banc statute, 28 U.S.C. § 46(c), until 1948, seven years after the legislative materials cited in the text. But as the Supreme Court explained in *Western Pac. R.R. Corp. v. W. Pac. R.R. Co.,* 345 U.S. 247, 251–57, 73 S.Ct. 656, 658–61, 97 L.Ed. 986 (1953), the subsequent history of § 46(c) reveals no change in the purpose of the in banc statute after its original introduction in 1941, and therefore it is appropriate to look to these older legislative materials.

3. The I.O.P. introductory explanation of policy makes clear that our Court's procedures are designed:

1. To insure the opportunity for contributions by every active member of the court to every decision of precedential or institutional significance.
2. To insure decisional stability of the court by providing a means for the panel system to operate efficiently and at the same time provide that a published opinion of the court expressed by a panel may not be overruled without the approval of a majority of the full court.

I.O.P.'s at iii.

4. I.O.P. 8C provides:

It is the tradition of this court that reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court in banc consideration is required to overrule a published opinion of this court.

regular active service" would support our construing it to mean "judges . . . in regular active service [who are not disqualified in a particular case]." [5] But despite the logical force of this construction, the Supreme Court has declined to endorse a particular view of § 46(c), holding instead that each Court of Appeals "is left free to devise its own administrative machinery to provide the means whereby a majority may order such a hearing." *Shenker v. Balt. & Ohio R.R. Co.*, 374 U.S. 1, 5, 83 S.Ct. 1667, 1670, 10 L.Ed.2d 709 (1963) (quoting *Western Pac. R.R. Corp., supra,* note 2, 345 U.S. at 250, 73 S.Ct. at 657).[6]

Until recently, most Courts of Appeals followed the same in banc vote-counting rule that our Court employs. Of late, however, a new trend has developed. As of now, four circuits—the Fourth,[7] the Seventh,[8] the Eighth,[9] and the Ninth [10]—have chosen to grant in banc reconsideration whenever favored by a majority of the non-recused judges.[11]

While I acknowledge that sound reasons have been advanced to support this new trend, I am not persuaded that it represents the ideal accommodation of the conflicting demands of fairness to the individual litigant and stability in a circuit's decisional law. Whatever may be the best solution, I believe that the current lack of uniformity among the circuits on this important issue creates the appearance of rights determined by happenstance. Accordingly, though I do not advocate that our Court use its rule-making power to follow the new trend, I do record my concern with the intercircuit conflict over the rules for granting in banc reconsideration and express the thought that Congress or the Supreme Court should provide definitive guidance at an early occasion.

---

5. This construction is reinforced by the fact that § 46(c), as originally drafted in 1941, distinguished between the two usages of "active judge": "the majority of the circuit judges may provide for a court of all the active and available circuit judges of the circuit to sit in banc. . . ." *See* H.R.Rep. No. 1246 (to accompany H.R. 3390), 77th Cong., 1st Sess. (1941).

6. Because *Shenker* was decided some 11 years before Congress imposed a strict new rule of disqualification codified at 28 U.S.C. §§ 455(b)(4), (d)(4) (1976), it might be appropriate for the Supreme Court to re-evaluate *Shenker's* broad grant of discretion to interpret § 46(c). That provision was enacted in an era when recusals were far less common, and when Congress probably could not have foreseen the effect of frequent recusals on the in banc voting procedure. So far, however, the Supreme Court has chosen not to re-examine § 46(c)'s interpretation by the circuits. *See In re American Broadcasting Companies,* — U.S. —, 104 S.Ct. 538, 78 L.Ed.2d 718 (1983) (denying writ of mandamus to compel rehearing in banc after the Sixth Circuit refused a rehearing, despite a 5–4 vote by participating judges in favor of an in banc with one recusal).

7. *Arnold v. Eastern Air Lines,* 712 F.2d 899, 901–906 (4th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984).

8. Announcement of Amended Seventh Circuit Operating Procedures (April 18, 1983) ("A simple majority of the voting active judges is required to grant a rehearing").

9. Eighth Circuit Local Rule 16(a) provides in relevant part:
   A majority of the judges . . . who are not disqualified in the particular case or controversy may order a hearing or rehearing en banc.

10. *Ford Motor Co. v. FTC,* 673 F.2d 1008, 1012 n. 1 (9th Cir.1981) (Reinhardt, J., dissenting on other grounds). Significantly, under the Ninth Circuit's "limited" en banc rule, only 11 of the 23 active members of that Court sit on an en banc panel. Therefore, unlike our Court where participation by all ten active judges is the norm, en banc decisions in the Ninth Circuit are necessarily the product of a minority of that Court's members.

11. For a recent discussion of this trend, *see* Harper, The Breakdown in Federal Appeals, 70 A.B.A.J. 56 (Feb.1984).